## CHARLES J. BONAPARTE, Trustee, *vs.* CARRIE DENMEAD, Trustee, et al.

*Bill for Injunction to Restrain Maintenance of Stable Alleged to be a Nuisance.*

The bill in this case alleged that the defendants maintained a stable on the side of an alley opposite to one end of plaintiff's apartment house; that the unsanitary condition in which the stable was kept, the offensive and unhealthy odors arising therefrom, and the noisy conduct and profane language of the stablemen caused great annoyance and danger to the tenants in plaintiff's house, some of whom went away on account thereof, while the rent of others was for the same reason reduced. The bill prayed for an injunction restraining the owner of the stable and the lessee thereof from so using it as to cause discomfort or injury or the danger thereof, to the tenants in plaintiff's building. The evidence examined, and *held* not to show that the stable was managed so as to be such a nuisance as entitles the plaintiff to an injunction, but that he should be remitted to his remedy at law, and to the enforcement of the municipal ordinances relating to the deposit of manure on city lots, and to the prevention of offensive odors from stables, and for the repression of disorderly conduct and profanity.

*Decided May 15th, 1908.*

Appeal from the Circuit Court of Baltimore City (ELLIOTT, J.)

The cause was argued before BOYD, C. J., PEARCE, SCHMUCKER, BURKE and WORTHINGTON, JJ.

*Wm. Reynolds* and *W. Hall Harris*, for the appellant.

*David Stewart* and *Talbott Denmead,* for the appellees.

PEARCE, J., delivered the opinion of the Court.

The appellant, as trustee under the will of Walter R. Abell, deceased, is in possession and control of a parcel of land at the northwest corner of Charles street and Lafayette avenue in the city of Baltimore, running back to an alley paralled with Charles street, and known as Morton alley, upon which has been erected a large and costly building, designed for and now used and occupied as an apartment house, and known as "The Walbert Apartment House." Among these apartments are eight fronting on Morton alley, alleged by the bill to be among the largest and most valuable of the apartments contained in said building, for each of which eight apartments the plaintiff has been asking, and in some cases receiving, a rental of between $900 and $1,000 per annum.

On the west side of Morton alley and on the north side of another small alley leading west from Morton alley, is a two-story brick building, formerly used as a private stable connected with the residence of Talbott Denmead, deceased, but now owned by Carrie Denmead, trustee for Helen B. Gelston, and occupied by the Chesapeake Company, a corporation, as a stable for the use of its 18 horses employed in the business of selling and delivering coal in the city of Baltimore.

The bill was filed in December, 1906, and alleges that ever since the commencement of warm weather in that year, this stable has been a source of annoyance and discomfort to the occupants of The Walbert and especially to those whose apartments open on said alley, and are located opposite and near to said stable; that this discomfort and annoyance has been in part due to the filthy and unsanitary condition of the said stable and premises, and in part to the noise and uproar caused by taking out the horses in the morning, interrupting the sleep of the occupants of The Walbert, and the similar disturbance caused by the return of the horses in the evening, and by the boisterous and offensive language and conduct of the men in charge of said horses; that the tenants of The Wal-

bert have become alarmed lest their health should suffer by reason of the unsanitary condition of said stable, and also fear that their lives and property may be endangered by fire due to the careless supervision of this stable; that a fire did occur recently because of carelessness in supervision, and that no attempt has been made by any of the defendants to maintain order on the premises, or to prevent them from becoming a nuisance to the neighbors.

The bill further alleges that the plaintiff has received numerous complaints from the tenants of The Walbert urging him to have the nuisance abated; that he has applied to the Police and Health Department of the city, but has secured thereby only imperfect and temporay relief; that by reason of the situation, one of his tenants removed from The Walbert at the end of his tenancy, and another gave up his apartment on Morton alley, and took another in a different part of the building, at a lower rent, and others have threatened to remove from the apartments on the west side of the building, and he is apprehensive of grave and irreparable loss to the trust estate as a result of the situation; that whatever knowledge the individual defendants, Carrie Denmead, and Helen D. Gelston, may have had of the use to which said stable would be put when they originally allowed its occupation as a stable by the corporate defendant, they are now fully aware it cannot be used and maintained as charged without becoming a nuisance to the occupants of The Walbert, and that they are therefore now equally responsible as the corporate defendant for said nuisance.

The bill then prays that each of the said defendants may be temporarily, as well as permanently, enjoined from so using the said premises, or causing or permitting the use thereof, or leasing or renting, or receiving rent therefrom, with the purpose and intention that they should be so used as to cause annoyance, discomfort, or injury, or the danger or reasonable fear thereof, to the tenants or other lawful occupants of The Walbert, by reason of any of the things therein charged as caused by the said use of the said stable.

Carrie Denmead and Helen D. Gelston answering, alleged that the stable in question was occupied for about ten years after the death of Talbott Denmead in 1876, as a livery stable, then for about 15 years as a stable for a number of horses, and later as a blacksmith shop and stable until 1904, when it was leased for one year from February 15th, 1904, to the Chesapeake Company, which lease was renewed until February 14th, 1906, when a new lease was made at an increased rent ($360 a year) for one year from February 14th, 1906, and that it is now occupied as alleged in the bill.   They allege that the locality in question had been long used for stables, one being on the site of The Walbert before its erection; that they had legal right to lease the premises in question for a stable; that the Security Company has a large stable near by, and there are other stables in the same block; that the inconvenience and annoyance caused by the use of said premises as a stable are only such as are ordinarily caused by any stable of that kind; that they were not a nuisance when leased to the Chesapeake Company, and that if they have since become so, they are in no way liable therefor, and are not proper parties to the suit.   They further allege that when the plaintiff planned and erected The Walbert, he was fully aware that Morton alley had long been used and occupied for stables and other similar purposes, and that such stables have the right to exist in cities; and that he is in fact complaining of the legitimate use of said premises for a purpose indispensable in a large city.

The defendant corporation, answering, says that at first the manure from the stable was dumped into a pit on Morton alley, but this being complained of, the pit was abandoned and the manure was dumped on a vacant lot north of the stable; that afterwards it joined with the landlord, under the direction of the building inspector, in the erection of a tight wood and iron shed on Morton alley, and the manure is now taken through a door in the stable and deposited in this shed, from which it is at proper times removed, and that since this arrangement, the health inspector has told the defendant's

president the only complaints were about the odor of the manure when being removed, and that the management of this stable was of the best, and he had no suggestion to make in the matter.    It alleged that the carts used by the company are kept at the yard where the horses are taken from the stable in the morning and are attached to them; that the defendant's president, at least five days in the week, goes personally in the morning to supervise the work at the stable, before seven o'clock, and had never heard any boisterous or profane language from the men, but on complaint had ordered it should not occur, and had requested the police to watch the premises morning and evening to prevent any cause of complaint, and that every precaution was taken against fire.

Over 125 printed pages of testimony were taken, and upon hearing, the Circuit Court dismissed the bill, saying as to the owners, that it was clear Carrie Denmead had a right to rent the property for a stable, and that as lessor she could not be held liable for any cause of complaint growing out of the manner of its maintenance by the lessee, and saying as to the defendant corporation, that it was sufficient to say that no act or omission had been shown on its part which calls for the extraordinary remedy of injunction, and that the plaintiff should be left to the remedy at law, if any.

Seventeen witnesses were called by the plaintiff of whom ten were women and seven were men.    Mr. Mullikin occupied apartments on the first floor facing on Morton alley.    He said "I have suffered inconvenience from the odor of the stable and the noise of the men."    When asked to state the extent of the inconvenience from the odor, he said "Well it is more or less the odor which I presume would be the odor from a stable which comes into the apartment, and I make it a rule to ventilate the apartment from the court side."    When asked if he had complained to the landlord or his agent about the stable, he said, "I may have made a complaint just casually, that the stable was objectionable, but no written complaint."

Daniel F. Brown occupied apartments on the second floor on Morton alley.    He said the stable men indulged in much

loud talk and some profanity and that there was an unbearable stench from the stable.    He was there one year, and in November, 1906, moved to the Marlborough.    His wife was not well and he had to look for other apartments.

Dr. Evans occupied apartments on fifth floor on Morton alley.    The odor from the stable was so marked, they could not tolerate it, and they changed to the sixth floor, with little or no improvement.    He took a lease on that floor for a year from February 1st, 1907, after being on that floor from the previous September.

Mr. Tabb occupied apartments on the second floor opening on the Court in the rear of the building, but not on Morton alley.    He said in warm weather the stable odor was terrific. This witness referred to a number of colored houses near, which, he said, were filthy and unhealthy, and which he said the health department should take down, and said the only thing to cause the odor was the stable and those colored houses nearby.

Dr. Townsend, in January, 1907, health warden of the 12th ward, testified that complaint was made to him at that time of a nuisance at 1802 Morton alley, being the defendant's stable; that he found the alley very dirty and piled up with ice and that he noticed the ammonia smell that comes from a stable or from manure.    He said there was another stable further up the alley, and he sent notices to all persons using or owning stables on that alley, to clean up.    That he returned a few days later and found manure piled up thirty or forty feet high against the stable further up the alley, and a stream of dirty water flowing from it down the alley on the Walbert side.    He said the ammonia smell from a stable is stimulating, and not altogether pleasant, but would not say it was unhealthy.

Thos. Kimmit, the engineer at the Walbert, testified, "All the discomfort I know is, that the alley gets blocked up whenever a heavy rain comes and the manure pit there flows over.    The water rushes down on the Walbert side, and overflows the engine room 20 feet below the alley.    It is a

great place for rats and they are killed and thrown out in the alley, and it makes a terrible odor there; the ladies up stairs can't stand it.   The most of the water, I think, comes from piles of snow in the back yards, and from that manure pit."

Mr. Manning, the secretary of the plaintiff, said the building was first occupied in December, 1904, and that there were continuous complaints from the occupants as to this stable since the spring of 1905; that Mr. Brown gave up his apartments on that ground alone; that Dr. Evans said he thought seriously of doing so, and Miss Pue says she will have to leave at the end of her tenancy, and that Dr. Evans' rent was reduced $50 per annum in order to retain him.

Miss Gallagher, superintendent of the Walbert, occupies a first floor room on Morton alley.   The stable is just across the alley.   She said the odor is overpowering at night.   "I think the stable is badly kept.   I think a stable that shelters twenty-one horses is bound to be an objectionable place."

Miss Pue said "the odor is unbearable.   I cannot stay here in spring and summer.   It is impossible."

Mrs. Welsh said there was a most disagreeable odor, especially at night, and the noise in the early morning was very disturbing.

Mrs. Dr. Evans said there was a great deal of odor and sometimes at night she was obliged to get up and close the windows; that the alley was not kept dirty, but there are fumes coming from it.   That she did not know until recently that there was another stable further up the alley, and cannot say what it has to do with the odor.

Mrs. Loflin, Mrs. Hunter, Mrs. King aad Mrs. Dixon, all on different floors on this alley, say the odor is very disagreeable.   Mrs. Dixon could not say whether there was any cessation of odor after the stable was burned in the summer of 1906 and before it was rebuilt and reoccupied.   She also said the odor was not so objectionable as to induce her to move, and that she could not say she would not have taken the apartment if she had known of this stable; that she believed the people tried to keep the stable clean, but that the odor

from a stable is always bad even when the stable is clean; and that while disagreeable it is not unhealthy.

Miss Barclay said, "there was considerable odor from the stable, but a stable odor is a stable odor," and also said she would not change her apartment on eighth floor corner of Morton alley, for any other in the building.

We will now examine the defendants' testimony.

Wm. H. Waesche, president of the Chesapeake Company, testified that the company had occupied the stable four years; that every morning, immediately after the horses are fed, the stable man removes the manure and puts it in the covered iron shed, that the stalls are thoroughly cleaned out and finally washed out, the water running into a sewer near the door; that the horses are bedded with long rye straw which practically absorbs all the urine; that no urine flows from the stable into the alley, and has not done so except on one or two occasions when the sewer was choked; that in the winter season the manure shed or pit is emptied twice a week, and at other seasons every other day, because there would not be a full load to remove every day, and that they pay 25 cents a load for its removal except in winter; here are nine drivers and one stable man; the wagons are kept at the coal yard; the horses are taken down to the yard a little before seven and return to the stable between six and seven in the evening; that he gives personal supervision to the stable, both morning and evening, and has requested police to see that the men are not boisterous or profane; that no portable lights are used in the stable, one large stationary light with reflector being sufficient for all purposes, and that no smoking is allowed on the premises; and that he knows of nothing that could be done to remove the objections made against the stable; that before The Walbert was erected the manure was put in an open pit which was partly below the ground, but since that the pit has been filled up, and the present shed is on the level of the ground and tightly closed with roof and door as approved by Dr. Jones of the Health Department; that there is on Morton alley just above this stable, another conducted by a colored man named Morehead where

four horses are kept, and adjoining this are the Security Storage and Trust stables; that since this suit was brought he has seen manure in front of these stables piled in and near the alley, and draining into it; and that he has had a contract formerly with Dr. Bye and since with Dr. Spranklin, both veterinarians, to see that the stable was kept in proper sanitary condition.

On cross-examination he said it was about the time this suit was brought that it was discovered there was a sewer from the stable, which was choked, but this was relieved, and the pipe which before carried the hydrant water into the alley now discharges into the sewer.

Dr. Spranklin testified that he was a veterinarian, that he had contracts for the supervision of twenty-eight different stables in Baltimore City, among which was the stable here in question; that it was his duty under this contract to see to the hygiene of this stable, and that he visited and examined it at least once a week. He said it had board floors, and he always found them thoroughly cleaned, and free from any pools of urine or collection of manure; that all stables are bound to have a horse odor, no matter how they are kept; that he noticed particularly that the urine does not run out into the alley, but drains in the stable near the door.

Policeman Bell testified that this stable is on his beat; that sometime in the fall of 1906 complaint was made to him of the men hallooing to the horses when bringing them out in the morning, and bringing them in in the evening, and that he forbid this, and since has had no further complaint, and that he has never heard complaint of the use of profane language by the men; that once, about March, 1907, complaint was made that the alley was not kept clean. He reported it, and it has since been kept very clean. At the time of that complaint a pipe had burst in the stable, and the escaping water froze in the alley, until the pipe was repaired, and that was about the only time he saw any filth in the alley.

Mr. Talbott Denmead testified that he was the owner's agent in general charge of this stable, collecting the rent, &c.;

that before the burning of the stable in May, 1906, Mr. Bonaparte had complained of the manure kept in the open pit, and in response to this, he consulted the building inspector, and under a permit from him, a wooden shed covered with corrugated iron on the sides and roof was built above ground to contain the manure, and the old pit was filled in. The shed cost $55.

After the stable was built, Mr. Bonaparte on August 2nd, 1906, wrote Mr. Denmead, enclosing a letter from Mr. Daniel F. Brown, one of the tenants, complaining of the noisy and profane language of the men, and giving notice of his intention to give up his apartments, but neither he nor Mr. Bonaparte then made any other complaint. On September 25th, 1906, Mr. Bonaparte again wrote Mr. Denmead enclosing an extract from a letter of a lady occupying an apartment in the Walbert, complaining that "she was made ill by the annoying stable in the rear of the Walbert," and threatening to give up her apartment. Mr. Denmead replied to both these letters, that he had personally inspected the premises and had seen nothing that could give offence.

On October 1st, 1906, Mr. Bonaparte again wrote Mr. Denmead that the complaints made to him related mainly to the unnecessary noise and the profane language which was said to attend the opening and shutting of the stable, and that though at one time there was a great deal of complaint in regard to the odors and the want of cleanliness that he had not heard much of that lately. He also referred to a suggestion in Mr. Denmead's letter that he would consider leasing the stable to Mr. Bonaparte at the end of the tenant's lease (February 15th, 1907), and said that he did not want it, though he should be willing to consider a reasonable proposition on the subject.

Mr. Denmead further testified that the stable is drained by a sewer inside of the front door; that it was found to be choked in January, 1907, and it was repaired and put in complete order about February 1st at a cost of about $90; that the stable was valued to the trust estate of Mrs. Denmead at

$5,000, and that after the fire, Mr. Manning, as Mr. Bona-parte's agent, said he could use the stable for storage of coal, &c., and would like to have it in its then condition, without being repaired.

He described the Morehead stable on Morton's alley as badly kept, the manure being piled all over the place, and high above the top of the uncovered pit, and draining into the alley.   He also described the stable of the Security Storage Company, where the manure was kept in an open box standing on the alley line.·

The defendant's testimony was taken in May, 1907.   In October, 1907, on the·28th day, several witnesses were pro-duced in rebuttal to prove that the conditions were worse in the summer of 1907 than in that of 1906, though the sewer was put in complete order in February, 1907.   Mr. F. C. Loflin so testified, and said it was very bad in the summer of 1906.   But as this stable was burned in May, 1906, and was not reoccupied during the summer of 1906 this testimony seems to raise a presumption that the odor at that time was due to the other stables mentioned.

Mr. Loflin nevertheless remained at the Walbert for two years, until October 1st, 1907, and then acknowledged that he went from there to the suburbs, because one of his family had a liking for the suburbs, and he intended going there.

Dr. Evans being recalled said he observed no difference in the conditions since February, 1907, but was still occupying his apartments on the sixth floor.   Mr. Mullikin testified in like manner but was still in his old quarters on the first floor across the alley.    Dr. Townsend testified that among several hundred monthly complaints there was one, August 16th, against the drainage of the stable into the alley and he went up about the 23rd and found some drainage which appeared to come from under the entrance to the· stable, though the alley was clean; that he had been there since several times, and found the alley perfectly dry and free from any drainage from the stable.

The net result of the testimony is, that of the seventeen

persons produced by the plaintiff only two have actually given up their apartments, viz., Mr. Brown, who acknowledged he would have remained if he could have secured suitable rooms in another part of the building, and Mr. Loflin who remained till October, 1907, and then went to the suburbs to gratify a member of his family.

Dr. Evans took a new lease upon a higher floor with a reduction of rent and was still there when the case closed. It does not appear that a single one of the ladies had given up her apartment, and only Miss Pue had declared her purpose to do so.

It was not contended by the plaintiff that a stable in a city is *per se* a nuisance, and it could not have been so contended in view of the numerous authorities to the contrary. In this State, recent decisions have emphasized this rule of law. But, as was said in *Metropolitan Savings Bank* v. *Manion*, 87 Md. 81, "It is equally clear that a stable, whether used for livery purposes or for private convenience, may sometimes become a very great nuisance and source of discomfort against which the Courts would not fail to grant relief." And it was to the manner in which the stable in this case was alleged to be used and kept, that the plaintiff's testimony was directed. It must be borne in mind that this is not a suit at law for damages, as in *Manion's case, supra*, but a bill for an injunction, and it must also be remembered that "nothing is better settled in this State, than that the granting or refusing an injunction rests in the sound discretion of a Court of equity." *Welde* v. *Scotten*, 59 Md. 72. Even in the case of a suit at law, this Court said in *Manion's case supra*, "But the fact just noted suggests caution in dealing with the rights of the owners or occupants of (livery) stable property. It cannot be denied that a (livery) stable in a town adjacent to buildings occupied as private residences is, *under any circumstances, a matter of some inconvenience and annoyance* and must more or less affect the *comfort of the occupants*, as well as diminish the *value of the property* for the purpose of habitation. But this is equally true of various other erections that might be mentioned, which are indispensable, and which do, *and must*, exist in all towns."

In *Dittman* v. *Repp*, 50 Md. 516, JUDGE ALVEY said: "In determining the question of nuisance from smoke or noxious vapor, or from noise or vibration such as is alleged in this case, reference must always be had to the locality, the nature of the trade, the character of the machinery, and the manner of using the property producing the annoyances and injury complained of.   *   *   *   Every one taking up his abode in the city must expect to encounter the inconveniences and annoyances incident to such community, and he must be taken to have consented to endure such annoyances to a certain extent."   The bill in that case asked an injunction against a brewery alongside of the plaintiff's wall, and alleged that it produced such a loud and deafening noise, and so great a jarring and shaking of his whole house, that it would be impossible for him or his family to remain in it. The injunction was granted on this bill and the defendant's answer, who did not, when filing it, move to dissolve the injunction so as to obtain the benefit of their answer, and the case therefore depended upon the allegations of the bill alone, and the order was therefore properly affirmed upon those allegations.   Here however, instead of granting a preliminary injunction, there was an order to show cause why the defendants should not be temporarily enjoined.   Answers were filed showing cause, and the merits of the whole case come up on these answers and the testimony.   Referring to this testimony, the counsel for the defendants has well said in his brief, "If we took seriously the evidence of the ladies living at the Walbert, we should naturally expect subsequent testimony to show that all the alley apartments had been vacated," and the fact that but one of these has been vacated, and that not exclusively because of the alleged annoyances, must suggest caution in dealing with the rights of the owners and occupants of this stable through extraordinary and summary process of injunction.

In *Adams* v. *Michael*, 38 Md. 129, this Court said: "The granting of injunctions on applications of this character involves the exercise of a most delicate power, and the Court is always reluctant to act except in cases where the right is clear

and unquestioned, and the facts show an urgent necessity." That was an application to restrain a threatened, or rather an anticipated, nuisance, but the reference to the reluctance of the Court to act except in cases where the facts show an urgent necessity, is clearly applicable to an application like the present, against an alleged existing nuisance, where there is any reasonable doubt from the testimony as to the urgent necessity of applying this summary remedy.

In *Gallagher* v. *Flury,* 99 Md. 181, we said, "The proximity of dwellings to disagreeable or objectionable structures is an inevitable incident of life in cities and towns," and we cited what we may here repeat, from *Hyatt* v. *Myers,* 73 N. C. 232. "If a man chooses to live in town he must take the inconvenience of noise, dust, flies, rats, smoke, soot, cinders, &c., caused in the use and enjoyment of his neighbor's property, provided the use of it is for a *reasonable purpose,* and the manner *of using* it is such as not to cause any *unnecessary damage or annoyance* to his neighbors." We also said, "neither increased danger of fire, nor increase of insurance rates, nor *depreciation of property by the erection of a neighboring lawful building* will entitle him to relief by an injunction * * *. If the stable should be neglected and filth be allowed to accumulate and fester, the ordinances provide a remedy by fine and abatement when the nuisance arises."

In the present case the ordinances of the city provide an adequate remedy, at least in the first instance, for all the annoyances complained of. The restraint of disorderly conduct or profanity could be secured through the police. Sec. 96, of Art. 14, of the Baltimore City Code, forbids the deposit of any manure on any lot within the city limits without the consent of the owners or occupiers of the lots adjoining, under a penalty of five dollars for each and every offence, and five dollars for each and every day the same should remain. Sec. 126, of Art. 14, provides that if any stable in the city shall be so kept as that the filth or stench therefrom shall become offensive or annoying to any neighbor, the person keeping such stable shall pay a fine of five dollars for every such

offence, and a like sum for every day the nuisance shall be suffered to remain.

Sec. 52, of Art. 25, provides that if any person shall cause to flow into any street or alley any liquid or offensive matter, or shall suffer the same to be and remain on his premises, he shall forfeit and pay for every such offense a sum not exceed-twenty dollars.

The record does not disclose that any effort was made to enforce these ordinances by the city authorities, though complaint was made to them of the condition of this stable, and it is fair to presume that the authorities were unable to procure such evidence as would warrant recourse to these ordinances.

In view of all the facts in the case we are of the opinion that the learned Judge of the Circuit Court exercised a sound and wise discretion in leaving the parties to the remedy at law, and in dismissing the bill.

The view which we have taken of the effect of the testimony in this case renders it unnecessary to consider the interesting and able argument of the plaintiff's counsel as to the liability of the owner of premises who lets them free from nuisance, but who renews the lease, after the lessee has so used the premises as to create a nuisance, and so continues to use them.

> *Decree affirmed with costs to the appellees above and below.*