JOHN W. LOHMULLER, VINCENT L. PALMISANO, JOHN W. PRINZ AND MARTIN LEHMAYER

*vs.*

SAMUEL KIRK & SON COMPANY.

*Injunctions: nuisances; inconvenience in city life.   Silversmiths.*

The power to restrain a party from using his own property so as to destroy or materially prejudice the rights of his neighbor is within the well established jurisdiction of courts of equity.                                                    p. 87

But in a commercial, manufacturing city it is not every inconvenience to a party's dwelling that will call forth the restraining power of a court of equity.                      p. 87

An operation of hammers in a silversmith's shop and the noises necessarily incident thereto was held to be no just ground for issuing an injunction, at the instance of lawyers whose offices were near and opposite to the windows of the shop.      p. 90

*Decided June 19th, 1918.*

Appeal from the Circuit Court of Baltimore City. (STUMP, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, STOCKBRIDGE and CONSTABLE, JJ.

*William C. Coleman* (with *Semmes, Bowen & Semmes* and *Randolph Barton, Jr.,* on the brief), for the appellants.

*Harry N. Baetjer,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

The bill of complaint in this case was filed to enjoin an alleged nuisance, and the present appeal is from a decree dismissing the bill, after a hearing upon the bill, answer and proof.

The plaintiffs, John W. Lohmuller, Vincent L. Palmisano, John W. Prinz and Martin Lehmayer, were engaged in the practice of law, with offices in the Calvert Building, located at the southeast corner of Fayette and St. Paul streets, in the City of Baltimore. Mr. Lohmuller, Mr. Palmisano and Mr. Prinz have occupied rooms numbers 463 to 469, on the fourth floor, since February, 1916, and JUDGE LEHMAYER has had his office in rooms numbers 563 to 569, on the fifth floor, directly above the offices of the other plaintiffs, since 1905. The Calvert Building fronts on Fayette street, and that portion of the building in which the plaintiffs' offices are located extends back to an alley, between twenty-four and twenty-five feet wide, known as Bank Lane. The offices of the plaintiffs extend about thirty feet along Bank Lane, and have three windows opening on Bank Lane and a window on an alley between the Calvert Building and the Equitable Building, just east of the Calvert Building. The defendant, the Samuel Kirk & Son Company, owns and occupies a large building known as Nos. 106 and 108 East Baltimore street, in which it carries on the business of buying, selling and manufacturing jewelry, silverware and other valuable articles.

This building, which is fifty feet wide and four stories high, extends from the north side of Baltimore street to the south side of Bank lane, and from one-third to one-half of the north end of. the building is opposite the Calvert Building and the offices of the plaintiffs, and the remaining portion of the north end of the defendant's building is opposite the building of the New Amsterdam Casualty Company. The defendant's factory for the manufacture of silverware and for repair work is located on the fourth or top floor of its building, and at the north end of this floor the defendant has installed four iron hammers, used in the manufacture of repousse silver. These hammers, which weigh about three pounds each, are suspended above a bench and are operated by the foot of the silversmith. The fourth or top floor of the defendant's building is below the level of the fifth floor of the Calvert Building, and in the north end of the fourth floor of the defendant's building there are seven windows opening on Bank lane. The bench above which the hammers are suspended is opposite and about ten feet from the third window from the east side of defendant's building, and this window, according to the plat filed with the record, is thirty feet and nine inches from the east window of Judge Lehmayer's offices and twenty-seven feet from the east window on the sixth floor of the New Amsterdam Casualty Company Building. Henry Adams, a consulting engineer, and a witness produced by the plaintiffs, describes the use of these hammers as follows: "These hammers are secured on a bench. They are, I think, four of them, and they are suspended, the hammers are suspended about this bench, and at the edge of the bench there are bars, in the shape of a V, tapered bars, secured at the bench, and there is a small point at the end, tapered. Now, the hammer strikes near the support by foot power as the operator sits there and he can strike as strong a blow or as light a blow as he wants. He has his piece of silver on which the design is outlined in his hand and he has a feeling—he touches his

finger on the work and he moves that piece of silver over that point and strikes his blow continually, sometimes heavy and sometimes light, according to the design he wants to bring out. It is not a direct blow, it is an indirect blow. You hear the noise from the hammer here (indicating) and certain noise at the end of the bar. In the room itself when they are going, with the other machinery going, you do not hear that noise as penetrating as you hear it outside of the room." Mr. Kirk, the president of the defendant company, gave the following explanation of the use of these hammers: "I have drawings now that I have made myself of a device that I had hoped would lessen the noise and accomplish the same result, and after talking with our mechanics, and the foreman of our department and several of our men, it was found that if the devices were made and put in operation, it would lessen the noise very little and it would require the retraining of our entire force, as the snarling iron is the standard equipment, and it meant also that every chaser that we would get in from an outside source would have to be retaught, and another thing it did, it eliminated the sense of feel that the present iron has, and therefore it would practically make it very difficult to do the work. * * * I can explain it: The iron is held in a vice. It is a three pound hammer and the hammer is attached—the handle of that hammer is attached by a cord to a treadle that is held up by a spring, and on the other end is the spring that holds the hammer up. The hammer does not fall of its own weight, it falls on account of the blow, which is the weight of the man's foot as he puts it there. It is as near balanced as possible, almost like the scale. The piece of silver is put over the snarling iron and the men hold either one or two fingers on the iron in order to guide it. The sense of feel in the first two fingers of their hand must be absolutely accurate and keen, otherwise they cannot judge what they are doing. For instance, a direct blow would not accomplish the same

purpose. There is no other way to do it than the one way, and I think Mr. Adams will agree with me that that is true. We have studied every known method to try to reduce that noise, particularly since Judge Lehmayer's complaint, and we have spent a great deal of money in trying to relieve the situation."

JUDGE LEHMAYER described the noise as he heard it in his office as follows: "Well, these hammers when I am in my office, I suppose it would be as far away from me as one end of this Court Room is from the other, say about thirty or thirty-five feet, and they make a terrible noise. As for the windows (the windows in his office) being open, your Honor, the windows are kept open very often in October, and on a day like this. The windows are open at this time and also sometimes in March and sometime in April, and even in winter windows are kept open. It is true they are kept open only to a small extent for the purpose of ventilation. The noise is of such a character that it absolutely renders it impossible to use the offices when it is going on. It is intermittent. It used to go on day after day, but since this bill has been filed it has decreased. They do not use the hammers as much now, but before it was at all hours of the day, sometimes one hammer was going, sometimes two and sometimes three, three at one time. * * * It is a peculiar penetrating noise. It goes right through you, it affects the nerves, it is a nerve-racking noise. It is almost enough to give you nervous prostration. No matter how hot it is, if you want to stay in my office you have to close the windows and keep them closed to carry on a conversation. I would have my stenographer at the opposite side of my desk dictating a letter to her and all of a sudden these hammers would start and that would be the end of it. I would either have to shut the windows or go in one of the further rooms that Mr. Binswanger occupies,—he is a sub-tenant of mine. * * * You can not conduct an ordinary conversation while these noises are going on. You can not hear a telephone conversation."

He also stated that the noise came in through the window opening on the alley between the Calvert Building and Equitable Building, and further testified as follows: "Q. (By Mr. Baetjer): You mean the noise would come around there? A. Yes, the noise from the hammers, yes. (The Court): Around the corner? (The Witness): Yes. (Mr. Coleman): There is a court there? (The Witness): Yes. That is almost as close as the other windows. You hear the noise there just as bad. When you strike iron on iron it gives a peculiar noise, but when that iron in turn strikes silver it is a reverberating noise, almost enough to set you crazy." Mr. Lohmuller, who, as we have said, occupied one of the offices on the fourth floor, below the offices of JUDGE LEHMAYER, and other witnesses, testified to the disturbing character of the noise to those occupying the offices of the plaintiffs when the plaintiffs' windows and the windows in the defendant's building were open, and the difficulty of carrying on a conversation over the telephone. Mr. Adams, the consulting engineer, who, by arrangement between the plaintiffs and the defendant, examined the defendant's factory, and tested the noise in JUDGE LEHMAYER's office with the windows in his office and the defendant's building open, and while the hammers were being operated for the purpose of affording him every opportunity to do so, described the noise as follows: "JUDGE LEHMAYER was sitting opposite me at his desk, and I talked to him and it was very difficult—that is annoying all the time. Your attention was called to these noises all the time on your ears while you were there, continually so. * * * It is exceedingly annoying. It is not a continuous sound you could get used to; it is a loud and then reduced again sound, and then goes ahead, continually changing all the time." When asked whether he, as an expert, could suggest any way in which the noise could be remedied, he replied that they could not change the machines very well "because expert workmen and the touch has to be there," but that he thought something could be done by putting a glass enclosure around the bench above

which the hammers were suspended; by moving it to another but less favorable location in the shop; by putting a canvas deflector in front of the defendant's windows and the windows of JUDGE LEHMAYER's office, or by putting a glass deflector two feet wide in JUDGE LEHMAYER's office window. He further testified on cross-examination that the factory of the defendant was crowded; that it is necessary in a manufacturing plant to have the various units together so that the work can be passed from one to the other, and that that is particularly so in a business like the defendants, where there are precious metals and "there could be a loss"; that the president of the company had his office in the factory on a raised platform, where he could overlook the entire floor, and a telephone on his desk, and that Mr. Kirk, the president of the defendant, said to him that he was willing to pay a handsome fee to anybody who could suggest a way to do away with the noise, and that he "had tried every means they knew of, including the employment of engineers, to remedy it."

Mr. Laudeman, a witness for the defendant, who was the manager of the Calvert Building and had been connected with the company that owns the building for about twenty-three years, testified that he occupied offices on the sixth floor of the building, immediately over the offices of JUDGE LEH- noise from the defendant's factory; that JUDGE LEHMAYER had complained to him about the noise and had asked that his rent be reduced on account of it; that the rent had not been reduced but that the rent was going to be raised, and that JUDGE LEHMAYER was aware of that fact. Mr. Pearre, a witness for the defendant, testified that he was the secretary and treasurer of the New Amsterdam Casualty Company, and occupied offices in the company's building in which there were two windows on Bank lane, and that he had never had any complaints about, and had never been annoyed by, noises from the factory of the defendant. Mr. Breckett, the assistant secretary of the New Amsterdam Casualty Company, whose office is on the sixth floor of that company's

building, testified that his office is a little above the level of
the top floor on which the defendant's factory is located, with
three windows opening on Bank lane opposite the defendant's
building; that he had occupied his office, and had been almost
"continually" in it during the business hours of the day, for
about two years, and that he had never been annoyed by noise
from the defendant's factory. It appears by the plat we have
referred to that the east window in this office of Mr. Breckett
is only twenty-seven feet from the window in defendant's
factory opposite which the bench over which the hammers are
suspended is located. Mr. Henry C. Kirk, who succeeded his
father as president of the defendant company, and who had
been connected with the company, and the partnership that
preceded the organization of the company, for thirty years,
testified that his entire business career had been with that
company, and that he had charge of the manufacturing and
designing department, and gave his entire time to it, and that
his office was situated in the centre of the fourth floor "right
in the centre of the manufacturing"; that the firm of Samuel
Kirk was organized in 1815, and had been engaged in the
manufacture of silverware at 114 East Baltimore street from
that date until 1894; that in 1894 they moved into the build-
ing 106 East Baltimore street, and that in the following year
they also occupied the building 108 East Baltimore street,
and continued their business in those buildings until the fire
of 1904; that after the fire the defendant erected its present
building at a cost of $200,000, and has occupied it since the
summer of 1905; that the defendant has invested in the ma-
chinery and tools in its factory about $90,000; that its build-
ing was erected "especially for the purpose" for which it is
used, and that to change the location of the hammers would
require the defendant to either re-arrange its entire shop,
which would be very expensive, or to move its factory to an-
other location. It further appears from the testimony of Mr.
Kirk that the hammers referred to have always been used by
the defendant, and those who preceded it in the business, and

that they are indispensible in the manufacture of silverware. When the defendant occupied 114 East Baltimore street the windows of its factory opening on Bank lane were opposite Barnum's Hotel, located on the present cite of the Equitable Building, and a type foundry. The building in which the type foundry was located was subsequently purchased by the Calvert Building and Construction Company, but was used by the type foundry for a number of years thereafter. It adjoins the Equitable Building, and, under a lease from the Calvert Building and Construction Company, is now occupied by the Baltimore City Printing and Binding Company, which conducts a printing establishment there. The building now owned by the New Amsterdam Casualty Company was formerly the "St. Paul Telephone Exchange" building, and after the fire of 1904 was used, for four years, as a hotel, and the rooms in the "rear part of the hotel," on the fifth and sixth floors, were used as guest rooms. Mr. Kirk also explained why it would not be practicable for the defendant to put a glass enclosure around the hammers, or canvas screens outside of its windows, and stated that the complaint of JUDGE LEHMAYER was the first and only complaint the company, or those who preceded it in the business, had ever received about the noise from its or their factory.

The bill of complaint alleges that the section of the city in which the plaintiffs' offices and the defendant's building are located had never been a "factory district," but had been for many years "a retail business, and office building district," but the evidence in the case tends to show that in addition to the defendant's factory, the type foundry and the printing establishment referred to above, there have been a number of other like enterprises and several bowling alleys conducted in that neighborhood.

The bill prayed that the defendant be enjoined from operating its hammers in such manner as to produce the noise complained of, and in regard to the principle invoked by the plaintiffs in this case there can be no question or difficulty.

The power to restrain a party from so using his own property as to destroy or materially prejudice the rights of his neighbor is within the well established jurisdiction of courts of equity. But, as was said by JUDGE ALVEY in *Adams* v. *Michael*, 38 Md. 123, "It is not every inconvenience—in the nature of a nuisance to a party's dwelling, especially in a large commercial and manufacturing city, that will call forth the restraining power of a Court of chancery by injunction. To justify an injunction to restrain an existing or threatening nuisance to a dwelling-house, the injury must be shown to be of such a character as to diminish materially the value of the property as a dwelling, and seriously interfere with the ordinary comfort and enjoyment of it. Unless such a case is presented a Court of chancery does not interfere. It must appear to be a case of real injury, and where a Court of law would award substantial damages." In the case of *Dittman* v. *Repp*. 50 Md. 516, the same learned judge said: "In all such cases, the question is, whether the nuisance complained of, will or does produce such a condition of things as, in the judgment of reasonable men, is naturally productive of actual physical discomfort to persons of ordinary sensibilities, and of ordinary tastes and habits, and as, in view of the circumstances of the case, is unreasonable and in derogation of the rights of the complainant. This is the criterion laid down in the authorities, and unless the facts show such a state of things, a Court of equity will not interfere. * * * And in determining the question of nuisance from smoke or noxious vapor, or from noise or vibration, such as alleged in this case, reference must always be had to the locality, the nature of the trade, the character of the machinery, and the manner of using the property producing the annoyance and injury complained of. A party dwelling in the midst of a crowded commercial and manufacturing city cannot claim to have the same quiet and freedom from annoyance that he might rightfully claim if he were dwelling in the country.

Every one taking up his abode in the city must expect to encounter the inconveniences and annoyances incident to such community, and he must be taken to have consented to endure such annoyances to a certain extent." Of course, the learned judge did not mean that because a party lives in a city he is compelled to endure all kind of noises, for he said there was a limit to the discomfort and annoyances to which a party living in a city or manufacturing district is "required to subject himself without remedy." But what the Court meant was that in determining whether the plaintiff is entitled to the relief sought, the Court must take into consideration not only the character of the noise, but also the locality in which the alleged nuisance is created. These cases are quoted and approved in the more recent cases of *Hendrickson* v. *Standard Oil Company,* 126 Md. 577, and *Singer* v. *James,* 130 Md. 382. In the case of *Gallagher* v. *Flury,* 99 Md. 182, JUDGE PEARCE said: "But the proximity of dwellings to disagreeable or objectionable structures is an inevitable incident of life in cities and towns. As was said in *Hyatt* v. *Myers,* 73 N. C. 233: 'If a man, instead of contenting himself with the quiet and comfort of a country residence, chooses to live in town, he must take the inconvenience of noise, dust, flies, rats, smoke, soot, cinders etc. caused in the use and enjoyment of his neighbor's property provided the use of it is for a reasonable purpose, and the manner of using it is such as not to cause any unnecessary damage or annoyance to his neighbors.'" In the case of *Bonaparte* v. *Denmead,* 108 Md. 174, this Court said: "It must be borne in mind that this is not a suit at law for damages, as in *Manion's Case, supra* (87 Md. 81), but a bill for an injunction, and it must also be remembered that 'nothing is better settled in this State than that the granting or refusing of an injunction rests in the sound discretion of a Court of equity.' * * * Even in the case of a suit at law, this Court said in *Manion's Case, supra,* 'But the fact just noted suggests caution in dealing with the rights

of the owners or occupants of (livery) stable property. It cannot be denied that a (livery) stable in a town adjacent to buildings occupied as private residences is, *under any circumstances, a matter of some inconvenience and annoyance* and must more or less affect the *comfort of the occupants,* as well as diminish the *value of the property* for the purpose of habitation. But this is equally true of various other erections that might be mentioned, which are indispensible, and which do, *and must* exist in all towns.' * * * In *Adams* v. *Michael,* 38 Md. 129, this Court said: 'The granting of injunctions on applications of this character involves exercise of a most delicate power, and the Court is always reluctant to act except in cases where the right is clear and unquestioned, and the facts show an urgent necessity.' That was an application to restrain a threatened, or rather an anticipated nuisance, but the reference to the reluctance of the Court to act except in cases where the facts show an urgent necessity, is clearly applicable to an application like the present, against an alleged existing nuisance, where there is any reasonable doubt from the testimony as to the urgent necessity of applying this summary remedy."

The cases to which we have referred and from which we have quoted dealt with alleged nuisances caused by noises, noxious gases and smoke affecting both the value and the enjoyment of the dwelling house or residence of the plaintiff.

In the case at bar at the time the suit was brought one of the plaintiffs was occupying his offices under a lease for one year, and the others had a lease for five years, beginning in February, 1916, and the rules and principles announced in the cases mentioned would seem to apply with even greater force to the facts and circumstances of this case where the alleged nuisance exists in the business section of a large city, and where the only injury complained of is the annoyance to which the plaintiffs are subjected when occupying their offices.

It would serve no purpose to make further reference to the evidence in the case, all of which we have carefully examined and considered. While it shows that the noise complained of does subject the plaintiffs, when they are occupying their offices with their windows and the windows of the defendant's factory open, to *some* annoyance and discomfort, the record does not, in our judgment, present such a clear case of an invasion by the defendant of the rights of the plaintiffs as entitled them to the relief prayed. It is, of course, the duty of the defendant to so operate its factory as to cause the plaintiffs no more annoyance and discomfort than is reasonable, and to be expected, and necessary in the proper and lawful conduct of its business. On the other hand, the plaintiffs cannot hope to escape the annoyances that are to be expected in the neighborhood in which they are located and which are incident to the reasonable and lawful enjoyment of the property of their neighbors. It is only where it is clear that the noise complained of is productive of actual physical discomfort to a plaintiff of ordinary sensibilities, and is, under all the circumstances of the case, unreasonable, and an invasion of his rights, that a Court of equity can intervene by injunction.

*Decree affirmed, with costs.*