# CIRCUIT COURT NO. 2 OF MORE CITY.

Filed March 11, 1927.

THE MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.,

VS.

THE UNION RENDERING COMPANY, INCORPORATED, AND THE BALTIMORE BUTCHER'S ABBATOIR AND LIVE STOCK COMPANY, INCORPORATED.

*Charles C. Wallace*, City Solicitor, and *E. J. D. Cross*, Deputy City Solicitor for the City.

*R. Ellsworth Jones, Philip B. Perlman, Wirt A. Duvall, Jr.*, and *Carl M. Distler* for other plaintiffs.

*Fisher & Fisher* for the defendants.

STEIN, J.—

The defendants are two bodies corporate; one the Union Rendering Company, which, since September 1, 1924, has continuously carried on the business of rendering offal, hoofs, horns, bones and blood of dead cattle, sheep and swine, in the premises in the City of Baltimore, it leased from the other defendant, the Baltimore Butchers' Abbatoir and Live Stock Company; and in carrying on such business, the bill charges, produces and discharges into the open air large quantities of "noxious, nauseous, sickening, offensive, foul-smelling and injurious gases, odors and vapor," which permeate and taint the atmosphere; cause "the residents in the neighborhood to be sickened, to be deprived of pure and fresh air, and of the free and full use of their properties, jeopardizing the health of such residents, impairing the values of their properties and the reasonable use and enjoyment thereof." The plaintiffs are the City of Baltimore, two hospitals, bodies corporate, and seven individuals, all occupying and/or owning properties affected by such gases, odors and vapors.

The testimony shows among other things: that in 1884, the landlord defendant, acquired a large tract of land, then in Baltimore County, now in Baltimore City, through the annexation of 1888; that in 1886 it erected on part of the tract, a building, in which it thereafter continuously carried on the rendering business; that, by lease dated August 21, 1924, it leased to the Union Rendering Company, for a five-year renewable term, beginning September 1, 1924, the building above named, and all "machinery, fixtures, implements, utensils and things then used by the landlord in the business of manufacturing fertilizer"; continued its rendering business, until September, 1924, when the term in the lease began, when the tenant then began and ever since carried on a rendering business, like that theretofore conducted by its landlord; but in such greatly increasing volume, that at the hearing, the testimony showed, the tenant rendered between three and four times as much materials as the landlord had; in so doing used all materials its landlord could supply from its slaughtering business, collected the balance needed from butchers and meat dealers, in the City and vicinity. Almost as soon as the Rendering Company began business, the people living in the neighborhood and vicinity of its plant, complained to the city authorities of a nuisance, consisting of foul and ill-smelling odors permeating the surrounding atmosphere; on investigation the City's Health Commissioner found those odors came from the rendering company's plant, and were a nuisance; notified the company to that effect and required that such nuisance be abated. In its efforts to comply with such notice, the company at once employed as consulting engineer, Dr. Penniman, an analytical chemist of high repute, to advise it as to what was necessary to be done to abate such nuisance; on his advice, promptly given, the company installed at once a collecting and ventilating system, to collect the noxious odors inside the plant, to force them up a chimney, and through a chlorinating apparatus installed therein to destroy all odors passing up the chimney.

The testimony also shows, the ventilating system was so effective as to collect and force up the chimney at least ninety-five per cent. of the odors in the plant; it did not collect or force up the chimney the odors given off by those parts of the offal to be rendered, which included the intestines of dead animals, and contained fecal matter; they were put through a washer and scrubbed; the water used in this process and the fecal matter washed out of the intestines were discharged into the open; the odors therefrom diffused into the air; and to this extent the nuisance complained, has never been abated.

The testimony also shows; that in 1884 when the landlord acquired the above named tract it was off in the country, in a non-residential section, with few, if any, dwellings nearby; that forty years thereafter, at the date the lease to the rendering company, the character of the section had changed entirely; then, it was thickly built up with fine two-story dwellings, occupied by home owners; then the City had built a fire engine house near the rendering company's plant; then a number of handsome and costly churches had been built in the vicinity; so that the section had become a

highly developed, thickly populated residential one; wholly unsuited for the location of a rendering plant.

The plaintiffs' testimony included many witnesses, who testified in open Court, and the stipulation of more than one hundred and twenty others, heads and/or members of families, each family either owning or occupying property affected by these odors. The stipulation recited it was to have the same force and effect as if the persons named therein had appeared in Court and testified under oath:

"That at numerous times during the last year and a half or two years, but not before, they have been annoyed by foul and sickening odors permeating the atmosphere surrounding their homes similar to and of the same general character as those described by other residents of the neighborhood in the vicinity of said plant, who have previously testified in behalf of the complainants.

"That the odors came from the plant of the Union Rendering Company. * * * That they have been sickened and nauseated at times by the odors, that they have had to close the windows of their homes, even on hot summer days and nights in their efforts to keep the odor out, that their sleep has been interfered with, and that, when the odors are present their appetites are impaired thereby and they are not able to eat their meals with comfort or enjoyment and experienced other unpleasant effects and annoyances."

The defendants produced many witnesses who testified they did not smell odors; among them were (1) the day and night police patroling the beat including the rendering company's plant; (2) past and present employees of it and of its landlord; and (3) persons living or working in the near neighborhood, most of whom testified they did not smell any odors, others testified that they smelled odors not disagreeable.

The testimony, upon which the rendering company relied most, to show no odors were emitted by its plant was: (a) that of a witness who sold and directed the installation of the chlorinating plant; (b) that of Dr. Hempel, the Assistant Health Commissioner, whose duty it was to see that any odors complained of were abated; (c) that of Dr. Penniman, employed by the rendering company to do everything necessary to destroy all odors discharged from the plant into the air, and (d) that of Professor McCollum, one of the foremost chemists of this country, if not of the world.

Dr. Hempel testified: he was in charge of the investigation of the odors complained of; that he had investigated many, if not all, of the complaints; had examined the company's plant many times, and that no odors emanated therefrom.

Dr. Penniman and Professor McCollum testified, that as a matter of chemical theory, the odors were entirely destroyed by the chlorinating process to which the odors were subjected; to this they added their testimony of instances where each went up an outside stairway to the opening at the top of the chimney; remained there for a short time, smelt the vapors and gases discharged, and did not smell any odor but that of chlorine; from which they gave their opinion as a matter of chemical theory, that the chlorinating process entirely destroyed all the odors of the plant that passed up the chimney. Dr. Penniman, Professor McCollum and the vendor of the chlorinating process, each testified that in every place with which they were familiar that had used this chlorinating process, it did not destroy all odors.

On the other hand, Dr. Wolman, an officer of the State Board of Health, who qualified as a chemist, testified for the plaintiffs that the chlorinating process did not always destroy odors, frequently masked them, so that after being diffused in the air with the chlorine, they would escape therefrom and could be smelt.

Witnesses for plaintiffs as for the defendants, testified that the chlorine gas could be smelt in the air in the vicinity of the plant; the defendants' witnesses not giving value to the testimony of some of the plaintiffs' witnesses that the chlorine gas annoyed them, that its inhalation was disagreeable, and that in some instances it produced an irritation of the throat and lungs.

Measuring this testimony by the rule referred to in Longley's Case, 115 Md., 182 at 194, Pearce, J., that

"One credible witness who testifies affirmatively to a fact at issue, must outweigh a dozen equally credible wit-

nesses whose testimony is negative, merely,"

and applying it, not as a rule of arithmetic, but as recognizing, the well established doctrine, that affirmative evidence is much more persuasive than negative evidence; and considering only such of the plaintiffs' evidence as was not excepted to, the overwhelming weight of the plaintiffs' affirmative evidence, overcomes the defendant's testimony, and establishes, as proven, the charges of the bill, that the Union Rendering Company has committed and is still committing a nuisance by discharging unto the outside air, foul and ill-smelling gases of the kind and character set out in the bill.

The defendants offered testimony tending to show that the odors complained of did not emanate from the Rendering Company's plant, but emanated from certain named sources, viz: from the Lafayette avenue dump; from the dumping by the City of fecal matter into Gwynns Falls, and from other rendering plants situate along the Falls, in a southerly direction from that of the Union Rendering Company.

This is met by the testimony of the plaintiffs' witnesses that they smelt odors like those complained of in the bill, that they traced them to their source, which they found to be the plant of the Rendering Company; so that in view of the finding that like odors emanate from the plant of the Union Rendering Company, the emission of odors from any one or more of the other sources named by the defendants' witnesses, is not a defense to these proceedings.

"It is no answer to a complaint of a nuisance that a great many others are committing similar acts of nuisance. * * * Each and every one is liable to a separate action and to be restrained." Woodyear vs. Schaeffer, 57 Md. 1 at 9.

As the testimony established the fact that the Union Rendering Company's plant creates and discharges into the air odors of the kind named in the bill, which affect the plaintiffs in the manner therein set out, the rights of the parties hereto are governed by the following rules laid down by the Court of Appeals. The real question in all the cases is a question of fact, viz: ·

"Whether the annoyance is such as materially to interfere with the ordinary comfort of human existence?" Adams vs. Michael, 38 Md., 123 at 128.

"It is not necessary that a public nuisance should be injurious to health; if there be smells offensive to the senses, that is enough, as the neighborhood has a right to fresh and pure air." Woodyear vs. Schaeffer, 57 Md., at 11.

They are set out in Lohmuller vs. Kirk, 133 Md. 78 at 87 and 88, thus:

"In all such cases, the question is whether the nuisance complained of will or does produce such a condition of things as, in the judgment of reasonable men, is naturally productive of actual physical discomfort to persons of ordinary sensibilities, and of ordinary tastes and habits, and as, in view of the circumstances of the case, is unreasonable and in derogation of the rights of the complainant. This is the criterion laid down in the authorities, and unless the facts show such a state of things, a Court of Equity will not interfere. * * * And in determining the question of nuisance from smoke or noxious vapors, or from noise or vibration, such as alleged in this case, reference must always be had to the locality, the nature of the trade, the character of the machinery, and the manner of using the property producing the annoyance and injury complained of. A party dwelling in the midst of a crowded commercial and manufacturing city cannot claim to have the same quiet and freedom from annoyance that he might rightfully claim if he were dwelling in the country. Everyone taking up his abode in the city must expect to encounter the inconveniences and annoyances incident to such community, and he must be taken to have consented to endure such annoyances to a certain extent."

They are affirmed in Block vs. Baltimore, 149 Md. 39 at 56, in which the Court of Appeals held restrainable by injunction as a private nuisance:

"Conditions which prevent individuals from eating, sleeping or living in comfort in their own homes, and which substantially lessen the value of their properties."

Applying these rules to the evidence in this case, I find the defendant, the Union Rendering Company, in carrying on its rendering business, emits the noxious vapors and gases as set out in the bill, in so doing creates a nuisance of the character condemned by the Court of Appeals in the cases above named, that said vapors and gases produce actual physical and actual dis-

comfort to the persons of ordinary sensibilities, tastes and habits living in the vicinity of the plant, among whom are the individual plaintiffs and the occupants of the properties owned by the corporate plaintiffs; that the neighborhood in which the individual plaintiffs reside and own property, and in which the corporate plaintiffs own property, is not a commercial or manufacturing neighborhood, but a residential one; that in view of the circumstances of this case, as shown by the testimony therein, the creation and maintaining of this nuisance is unreasonable and in derogation of the rights of the complainants, in that it deprives them of pure and fresh air, is injurious to their health and properties. Its continuance, therefore, should be restrained by injunction.

I find that the defendant, the Baltimore Butchers' Abbatoir and Live Stock Company, did not create and/or authorize, and does not maintain such nuisance, that the evidence in this case shows, when it rented the premises to the Rendering Company under the lease above named, it did not know and had no reason to believe that the business of the Union Rendering Company would be increased so greatly as to cause the above nuisance; the plaintiffs, therefore, are not now entitled to any relief against this defendant.

As the Union Rendering Company promptly tried, and is still trying to abate the nuisance complained of, I will not now order a peremptory injunction to issue against it at once, but will give it further time to fully abate such nuisance.

I will sign a decree: (a) finding the facts hereinabove set out; (b) giving the Union Rendering Company until and including the thirty-first day of May next to entirely abate the nuisance complained of; if not then so abated, an absolute injunction will issue; (c) dismissing the bill against the Baltimore Butchers' Abbatoir and Live Stock Company; without prejudice to the plaintiffs hereafter to proceed against it; (d) and requiring the Union Rendering Company to pay costs.

The reasons hereinabove set out make it unnecessary to pass upon the various motions and exceptions filed by the parties. The facts found are based only on testimony of each side to which objection was not made.