*RDC Melanie Drive, LLC v. Mark R. Eppard, et al.*, No. 48, September Term 2020. Opinion by Hotten, J.

**CIVIL PROCEDURE – RES JUDICATA – COLLATERAL ESTOPPEL**

The Court of Appeals held that the issue of whether restrictive covenants prohibited a commercial golf driving range on any lot within a residential subdivision was neither barred by *res judicata* nor collateral estoppel. *Res judicata* did not apply because the issues litigated in a previous matter and the current matter were distinct. The former concerned a zoning variance and the latter concerned the application of a restrictive covenant. Collateral estoppel did not apply because a zoning board in the first matter expressly declined to consider the issue of restrictive covenants, which prevented the issue from being "actually litigated and determined by a valid and final judgment[.]" *Cosby v. Dep't of Hum. Res.*, 425 Md. 629, 639, 42 A.3d 596, 602 (2012).

**PROPERTY LAW – RESTRICTIVE COVENANTS – CONSTRUCTION AND OPERATION**

The Court of Appeals held that a restrictive covenant unambiguously intended to preserve the residential character of a small, single-family home community by applying a "reasonable construction" of a restrictive covenant as first articulated by the Court in *Belleview Construction Co. v. Rugby Hall Community Ass'n*, 321 Md. 152, 158, 582 A.2d 493, 496 (1990) (citation and internal quotation omitted). The Court also concluded that a majority of homeowners within the residential community validly amended the restrictive covenant by prohibiting a commercial golf driving range on any of the lots within the community. The amendment clarified a preexisting and uniform restriction on all of the lots that prevented offensive or noxious trades or activities and any activity that may become an annoyance or nuisance.

**PROPERTY LAW – RESTRICTIVE COVENANTS – CONSTRUCTION AND OPERATION**

The Court of Appeals held that a restrictive covenant unambiguously permitted the realignment of a lot boundary line. A restrictive covenant prohibited the creation of new lots through subdivision but expressly permitted the "adjustment or realignment of boundary lines[.]" A property owner permissibly realigned the boundary of their property pursuant to the plain language of the restrictive covenant.

IN THE COURT OF APPEALS

OF MARYLAND

No. 48

September Term, 2020

_____

RDC MELANIE DRIVE, LLC

v.

MARK EPPARD, ET AL.

_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

_____

Opinion by Hotten, J.

_____

Filed: July 15, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

The parties in this appeal own property in the Swan Point Subdivision ("Swan Point"), located in Talbot County, Maryland.[1]  Swan Point consists of six lots, reflected in the tax record as Lots A, B, C, D, 5, and 6.  Petitioner, RDC Melanie Drive, LLC ("RDC") owns a nearby golf course, now known as the Links, and purchased Lot 6 in 2015.  The present dispute arises from an effort by RDC to convert Lot 6 into a commercial golf driving range ("a driving range" or "the driving range").  Respondent, Mark Eppard, *et al.* ("Homeowners"), represent four of the other five property owners in Swan Point who oppose RDC's proposed plan to construct a driving range on Lot 6.[2]

On August 21, 2017, RDC applied for zoning variances and exceptions from the Talbot County Board of Appeals ("the Board") to modify the boundaries of Lot 6 and to construct the driving range.  The Homeowners opposed the variance, contending that a restrictive covenant, applicable to all lots within Swan Point, prevented the construction of the driving range.  The Board did not address the issue of the restrictive covenant, but granted the zoning variance for RDC.  In response, the Homeowners amended the restrictive covenant to specifically prohibit a driving range on any lot within Swan Point.

The Homeowners sought judicial review of the Board's determination in the Circuit Court for Talbot County.  Following a hearing on May 16, 2018, the circuit court found

---

[1] "Swan Point [] is part of a larger subdivision that was created by a subdivision plat, . . . prepared by William W. Ludlow Jr., dated November 28, 1987 . . . and recorded among the Plat Records of Talbot County[,] Maryland in Plat Book 79[,] Folio 76." *Eppard v. RDC Melanie Drive, LLC*, C-20-CV-18-000079, slip. op. at 2 (Md. Cir. Ct. July 12, 2019) (memorandum opinion and declaratory judgment).

[2] The sixth property owner, Old Martingham LLC, declined to participate in any of the proceedings.

that most of the decisions of the Board were supported by substantial evidence and following a remand to the Board for additional findings, affirmed the decisions of the Board on November 19, 2018.

The Homeowners sought a declaratory judgment in the circuit court for a determination that the original Swan Point restrictive covenant, the Homeowners' amendment to the original Swan Point restrictive covenant, and a restrictive covenant specifically applicable to Lot 6—recorded in 2008 by former owners Vladimir D. Zajic and Etta K. Zajic ("Zajic Declaration")—prohibited the driving range. RDC filed a counter complaint, contending that the development of a driving range and a realignment of the property boundaries of Lot 6 was not prohibited by the restrictive covenants. The circuit court entered a declaratory judgment, concluding that the Homeowners' amended restrictive covenant validly prohibited the construction of a driving range on Lot 6, and the original Swan Point restrictive covenant permitted the realignment of Lot 6 property boundaries. The circuit court also declared that the controversy surrounding the Zajic Declaration was moot by virtue of the other declarations.

The parties cross-appealed the decision of the circuit court to the Court of Special Appeals, which affirmed. The Court of Special Appeals consolidated the questions presented and held that the determination of whether the original Swan Point restrictive covenant prohibited a driving range was not precluded by collateral estoppel and that the Homeowners' amended restrictive covenant validly prohibited a driving range on Lot 6. The Court of Special Appeals further held that the circuit court did not err when it declared the Zajic Declaration moot and that the circuit court correctly determined that it was

2

permissible under the original Swan Point restrictive covenant for RDC to realign the boundaries of Lot 6.

RDC timely appealed to this Court and the Homeowners filed a cross-petition. We granted the petition for *certiorari* and the cross-petition on January 6, 2021, *RDC Melanie Drive, LLC v. Eppard*, 472 Md. 4, 243 A.3d 1198 (2021), which resolve into the following five questions:

1. Whether the factual issue of whether a driving range constitutes a "noxious or offensive trade or activity" or causes any "annoyance or nuisance" is precluded by *res judicata* or collateral estoppel.

2. Whether the Original Declaration unambiguously restricts various activities to preserve the residential character of a small community of single-family homes?

3. Whether the Amended Declaration validly clarified the terms of the Original Declaration by prohibiting a commercial driving range on any lot within Swan Point?

4. Whether Article III, Paragraph 1, Subparagraph (k) of the Original Declaration permits the revision of existing lot lines?

5. Whether the controversy regarding the Zajic Declaration is moot?[3]

---

[3] We rephrased and reordered the questions presented for analytical consistency and clarity. RDC's petition for *certiorari* presented the following seven questions for review:

I. Whether, as a matter of first impression under Maryland law, the Amended Declaration is enforceable against RDC where the Amended Declaration adds new restrictions prohibiting golf course uses and driving ranges, and the language of the amendment clause of the Original Declaration does not expressly permit changes which add new restrictions?

II. Whether the [c]ircuit [c]ourt and the Court of Special Appeals erred in

(continued . . .)

ruling that the Amended Declaration does not add additional restrictions to Lot 6, where the Amended Declaration plainly adds new restrictions prohibiting golf course uses and driving ranges?

III. Whether the enforcement of the restrictions prohibiting any "noxious or offensive trade or activity" or any use that "may become an annoyance or nuisance," or any amendment thereto, is subject to review on an objective standard?

IV. Whether Respondents' claims that the use of Lot 6 as driving range will be "noxious or offensive" or cause "annoyance or nuisance" have been fully litigated before the Board of Appeals and those issues and claims are precluded by the doctrines of [collateral estoppel] and *res judicata*? And if not, whether RDC is entitled to trial on those issues and claims?

V. Whether the restrictions prohibiting any "noxious or offensive trade or activity" or any use that "may become an annoyance or nuisance to the neighborhood or other owners" are too vague to be enforced?

VI. Whether the Original Declaration prohibits golf course uses, driving ranges, or other commercial activity under uniform plan of development?

VII. Whether RDC is entitled to summary judgment on the Respondents' Claims arising from Article III, Paragraph 1, Subparagraph (m) of the Original Declaration and from the Zajic Declaration?

The Homeowner's conditional cross-petition presented the following five questions for review:

I. In this declaratory judgment action, were the lower courts obliged as a matter of law to review each provision of the applicable covenants addressed by the parties in the pleadings, and to declare the rights and obligations of parties based upon the language of the instruments, read together in accordance with their express terms and the intent thereof as stated in the instruments?

II. Did the lower courts err as a matter of law, by failing to render an analysis whether the Original Covenants, by their terms, intended only a residential and agricultural use subdivision?

(continued . . .)

4

We answer the first question in the negative, the second, third, and fourth questions in the affirmative and accordingly shall affirm the judgment of the Court of Special Appeals. We need not reach the fifth question presented.

## FACTS AND PROCEDURAL BACKGROUND

### The Underlying Incident

The Links, formerly known as the Harbourtowne Golf Course, is a golf course located in St. Michaels, Maryland. The Links was originally developed in the 1970s and

---

(. . . continued)

III. Did the lower courts err in failing to address the express provision of the Original Declaration, in Article III, ¶ 1 (m), [] prohibiting any excavations on any Lot within the subdivision except in connection with permitted buildings; and did they erroneously fail to integrate that provision with the Zajic [Declaration], approved and accepted by all the parties or their predecessors, that specifically prohibits the construction of any buildings on the agricultural portion of Lot 6? Alternatively stated, were the trial court and the Court of Special Appeals clearly in error by declaring that the issues arising under the Zajic [Declaration] were moot under the circumstances of this case?

IV. Did the lower courts err as a matter of law in their interpretation that the Original Declaration, Article III, ¶ (k), permits a boundary line adjustment with a non-subdivision lot for the purpose of permitting resort and golf course uses on land intended for only residential and agricultural use?

V. Did the trial court err as a matter of law by failing to address Cross-Petitioners' request for injunctive relief, and in the case of the Court of Special Appeals, did it likewise err in failing to remand this case to the trial court (as requested in the Homeowners' briefs in the Court of Special Appeals) to address the question of ancillary injunctive relief in light of both courts' conclusions that the Amended Declaration is a valid prohibition of driving range development?

5

is now part of the Perry Cabin resort. Swan Point was developed in 1988 and is adjacent to and contiguous with the Links. Swan Point contains six lots: A, B, C, D, 5, and 6.[4]

Each lot at Swan Point is subject to the covenants and restrictions described in the "DECLARATION OF RESTRICTIONS, COVENANTS AND CONDITIONS SWAN POINT" ("the Original Declaration"). In pertinent part, the Original Declaration provided:

> WHEREAS, the Declarants desire to provide for the *preservation of the values and amenities in the community comprised of their collective properties*; and *to this end, desire to impose upon the Property* [i.e., Swan Point] the covenants, restrictions, easements and equitable servitudes, hereinafter set forth, each and all of which are for the benefit of the Property and the owners thereof. . . . [A]ll of *which are declared and agreed to be in aid of a plan for the improvement of the Property . . .* and *shall inure to the benefit of and be enforceable by the Declarants, their successors and assigns*, and any person acquiring or owning an interest in the Property, including, without limitation, any person, group of persons, . . . or other legal entity. . . .

ARTICLE I

\*\*\*

> (a) "Declarant" shall mean and refer to the Declarants hereinabove identified in the preamble to this Declaration, and their successors and assigns. . . .
>
> (b) "Dwelling" shall mean and refer to any building or portion of a building situated upon the Property and *designed and intended for use and occupancy as a residence by a single person or family*.

\*\*\*

ARTICLE III

> 1. Prohibited Uses and Nuisances. Except for the activities of the Declarant during the construction or development *of the community*:
>
> (a) *No noxious or offensive trade or activity shall be carried on upon any Lot or within any dwelling, nor shall anything be done therein or*

---

[4] At the time of the present dispute, Albert G. Boyce and Kim T. Boyce own Lot B; Mark R. Eppard and Patricia A. Eppard own Lot C; Norman S. Hastings and Lily S. Hastings own Lot D; and Madeline C. Holmes owns Lot 5. Old Martingham, LLC owns Lot A, but has not participated in proceedings. RDC owns Lot 6. *See infra* page 9.

6

*thereon, which may be or become an annoyance or nuisance to the neighborhood* or other Owners. *Without limiting the generality of the foregoing*, no speaker, horn, whistle, siren, bell, amplifier or other sound device, except such devices as may be used exclusively for security purposes, shall be located, installed or maintained upon the exterior of any dwelling or upon the exterior of any other improvements constructed upon any Lot. No snowmobiles, go-carts, motor bikes, trail bikes or other loud engine recreational vehicles shall be run or operated upon any Lot or upon the roads serving the Property.

***

(b) The maintenance, keeping, boarding or raising of animals, livestock, or poultry of any kind, regardless of number, shall be and is hereby prohibited on any Lot or within any dwelling, except that this provision shall not prohibit the keeping of horses, dogs, cats or customary *household animals,* provided that such animals *are not a source of annoyance or nuisance to the neighborhood* or other Owners and do not roam at-large.

***

(f) No structure of a temporary character shall be erected, used or maintained on any Lot at any time.

(g) Except for entrance signs, directional signs, signs for traffic control or safety and such promotional sign or signs as may be maintained by the Declarant, no signs or advertising devices of any character shall be erected, posted or displayed upon, in or about any Lot or dwelling; provided, however, that one temporary real estate sign not exceeding four (4) square feet in area, may be erected upon any Lot placed upon the market for sale or rent. . . .

***

(k) No Lot shall be subdivided; provided, however, that *this restriction shall not be construed to prohibit the adjustment or realignment of boundary lines between Lots* as long as such adjustment or realignment shall not create an additional Lot.

***

(m) No excavation shall be made on any Lot except for the purpose of building thereon at the same time when the building operations are commenced, and no earth or sand shall be removed from any Lot except as a part of such operations; provided, however, that this restriction shall not be construed to prohibit the construction of swimming pools or ponds.

***

(q) Not more than one (1) dwelling shall be erected on any one (1) Lot within the Property, said dwelling *being restricted to a single family dwelling*. . . .

***

1. <u>Amendment</u>. *This Declaration may be amended by an instrument executed and acknowledged by two-thirds (2/3) of the Owners of the Lots within the community*, which instrument shall be recorded among the Land Records of Talbot County, Maryland. Unless a later date is specified in any such instrument, any amendment to this Declaration shall become effective on the date of recording. Except as required by the appropriate zoning authorities of Talbot County, while Declarant owns any Lot, no substantial change shall be made in this Declaration without the written consent appended to the amending instrument of all Owners, including Declarant.

2. <u>Duration</u>. Unless amended in accordance with the provisions of Paragraph 1 of this Article and the other requirements of this Declaration, and except where permanent easements or other permanent rights or interests are herein created, the covenants and restrictions of this Declaration shall run with and bind the land, and shall inure to the benefit of and be enforceable by the Owner of any Lot subject to this Declaration, their respective legal representatives, heirs, successors and assigns, for a term of thirty (30) years from the date of the recordation of this Declaration, after which the said covenants shall be automatically be extended until terminated by a vote of two-thirds (2/3) of the Owners of the Lots.

3. <u>Construction and Enforcement</u>. The provisions hereof shall be *liberally construed to effectuate the purpose of creating a uniform plan for the development and operation of the Property. . . .*

*** 

(Emphasis added).

In 2008, the former owners of Lot 6, Vladimir D. Zajic and Etta K. Zajic executed the Zajic Declaration, recorded among the land records of Talbot County at MAS Liber 1649, folio 503.[5] The Zajic Declaration provided in pertinent part:

---

[5] The Zajic Declaration was not recorded solely for the benefit of the Zajic family. The preamble to the Zajic Declaration also names Paul D. Haines and Ann N. Haines, Marsha E. Jewett, Mark R. Eppard and Patricia A. Eppard, and Norman S. Hastings and Lilly S. Hastings as "Benefited Owners[.]" At the time that the Zajic Declaration was recorded, these individuals owned Lots 5, B, C, and D, respectively. Only Lot A, now owned by Old Martingham LLC, was not named as a Benefited Owner.

1. <u>Prohibited Structures</u>. Commencing upon the Effective Date as hereinafter defined, *no structure, habitation or other building may be constructed on the Property*. This Declaration shall not prohibit, limit, restrict or otherwise impair the Declarants' rights, in their sole discretion, to use, maintain, repair, replace or improve the driveway located on the Property.

***

4. <u>Construction and Enforcement</u>. The provisions hereof shall be liberally construed to effectuate the purpose of the preservation of the natural values and amenities of the Property. . . .

(Emphasis added).

In 2015, RDC purchased the Links. As part of its redevelopment and operation of the Links, RDC sought to relocate the driving range to a waterfront property at 9599 Melanie Drive, St. Michaels. This property is designated as Lot 6 of Swan Point.[6] RDC also intended to expand its existing golf course onto a portion of Lot 6. On July 21, 2016, David W. Rattner, on behalf of RDC, sent a letter to all the Swan Point property owners, communicating RDC's intention to convert the southern portion of Lot 6 into a driving range. The letter provided in pertinent part:

> This plan enables us to lengthen the driving range and expand the 1st and 18th holes; moreover, relocating the driving range will allow us to significantly reduce the number of golf balls flying on to Martingham Drive. We hope Harbourtowne members agree that this will provide a much-improved golfing experience, and that residents will feel safer traveling along Martingham Drive.
>
> To this end, we recently proposed a zoning change to Talbot County, which would allow us to incorporate this piece of the lot [into] the golf course.

---

[6] Lot 6 was 29.711 acres before its conveyance and subsequent boundary modification by RDC. The proposed driving range would occupy approximately thirteen acres of the northern portion of the property. Lot 6 had been used as a spray field for the treated effluent from the nearby Martingham subdivision until the subdivision gained public sewer access. Lot 6 is partially located in a Critical Area on lands designated as a Resource Conservation Area. *See RDC Melanie Drive*, 2020 WL 5989518, at *3.

9

On July 29, 2016, the Zajic's conveyed their interest in Lot 6 to RDC.

On or about May 12, 2017, RDC submitted a Critical Area Variance and Special Exception Application for the driving range to the Board, which held evidentiary hearings concerning RDC's Application on August 7 and 21, 2017. Mark R. Eppard, Patricia A. Eppard, and Madeline C. Holmes appeared at the hearings, and through counsel, submitted a memorandum of law in opposition to RDC's Application. On November 17, 2017, the Board voted to approve RDC's requested variances, which included an expansion of the existing golf course onto a portion of Lot 6 to accommodate the relocated driving range and an associated access path and drainage. The Board determined that it lacked the authority "to consider the effects of or to enforce any private restrictive covenants that may impact the subject property."

On September 11, 2017, the Homeowners recorded an "AMENDED DECLARATION AND REAFFIRMATION OF RESTRICTIONS, COVENANTS, AND CONDITIONS FOR SWAN POINT SUBDIVISION" ("Amended Declaration"). The Amended Declaration provided in pertinent part:

> (u) No Lot within the Property, nor any portion thereof, shall be converted *from residential or agricultural use into a commercial or private golf course use, nor shall any Lot be utilized as or in connection with a driving range* or similar commercial use in connection with a golf course, it *being the intent of the subscribers hereto that the Swan Point subdivision retain its character as a residential, single family dwelling community*, and not be converted into a commercial resort property for use by members of the public, golf course members, or resort hotel guests.

(Emphasis added).

In January 2018, RDC recorded a plat entitled "MINOR REVISION PLAT ON THE LANDS OF RDC HARBOURTOWNE LLC AND MELANIE DRIVE, LLC[,]" among the Plat Records of Talbot County in Plat Book MAS 86/04, pages 4 and 5 ("Minor Revision Plat"), that adjusted the boundary line between Lot 6 and the neighboring golf course.[7] The boundary revision incorporated 12.811 acres of Lot 6 within the boundaries of the adjacent and contiguous golf course.

## Legal Proceedings

### A. The Circuit Court

The Homeowners petitioned the Circuit Court for Talbot County to review the Board's decision.[8] On May 16, 2018, the circuit court found that there was substantial evidence to support most of the findings, but remanded the case to the Board for additional factual determinations.[9] Following additional findings by the Board on remand, the Homeowners sought judicial review of the Board's decision a second time, which was affirmed again by the circuit court on May 6, 2019.

---

[7] The record indicates several contradictory titles for the Minor Revision Plat. We provide the title of the Minor Revision Plat as originally recorded in the county plat records.

[8] Pursuant to Md. Code Ann., Land Use § 4-401(a), "[a]ny of the following persons may file a request for judicial review of a decision of a board of appeals or a zoning action of a legislative body by the circuit court of the county: (1) a person aggrieved by the decision or action[.] . . ."

[9] The additional factual determinations included whether the lot's proposed use would affect marine, pedestrian, and vehicle traffic, existing agricultural uses, other permitted or nonconforming property uses, or exceed "the minimum adjustment necessary to relieve the unwarranted hardship."

The Homeowners sought declaratory judgment[10] in the circuit court that the applicable covenants prohibited the conversion of Lot 6 into a driving range. The Homeowners filed a motion for summary judgment and RDC filed a motion to dismiss or in the alternative a motion for summary judgment.

The circuit court granted the Homeowners' motion for summary judgment, agreeing with the Board that the interpretation and enforcement of covenants "lay beyond the capacity of the Talbot County Board of Appeals[.]" (Citation omitted). Therefore, according to the circuit court, the Homeowners did not have an opportunity to be heard on the issue.[11] As a preliminary issue, the circuit court granted RDC's motion for summary judgment regarding the Minor Revision Plat. According to the circuit court, the plain language of Article III, Paragraph 1, Subparagraph (k) of the Original Declaration restricted the creation of new lots, but permitted the adjustment or realignment of boundary lines. RDC's Minor Revision Plat only provided for a lot line revision, and therefore was not prohibited by the Original Declaration.

---

[10] Md. Code Ann., Courts and Judicial Proceedings ("Cts. & Jud. Proc.") §§ 3-401–415 governs declaratory judgments. Cts. & Jud. Proc. § 3-406 states:

> Any person interested under deed, will, trust, land patent, written contract, or other writing constituting contract, or whose rights, status, or other legal relations are affected by statute, municipal ordinance, administrative rule or regulation, contract, or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, administrative rule or regulation, land patent, contract, or franchise and obtain declaration of rights, status, or other legal relations under it.

[11] The circuit court also noted that because RDC successfully argued to the Board that the Original Declaration was beyond the jurisdiction of the Board, it negated its collateral estoppel argument.

With respect to the interpretation of the Amended Declaration, the circuit court concluded that "the Amended Declaration is consistent with the terms and purpose of the Original Declaration, and the [c]ourt will enter a declaratory judgment to that effect[.]" Article VI of the Original Declaration authorized the Homeowners to make amendments, and the circuit court declared that the Amended Declaration, which prohibited the construction of a driving range, "is a valid restriction on all of the lots in [] Swan Point [] and that it is appropriately applied to Lot 6. . . ." The circuit court also concluded that its findings rendered moot the issue of whether the proposed driving range would violate the Zajic Declaration.

## B. The Court of Special Appeals

The Court of Special Appeals affirmed the circuit court in an unreported opinion. *RDC Melanie Drive, LLC v. Eppard,* No. 1146, Sept. Term, 2019, 2020 WL 5989518 (Md. Ct. Spec. App. Oct. 9, 2020). The Court began its analysis by noting that the purpose of the Original Declaration was to "provide for the preservation of the values and amenities in the community comprised of their collective properties." *Id.* at *6. According to the Court, "the Swan Point lots were purely residential, unlike the bordering Martingham subdivision." *Id.* at *7.

The Court of Special Appeals agreed with the circuit court that the Amended Declaration was consistent with the Original Declaration, and the Amended Declaration supported a uniform plan for the development of Swan Point as a residential community. *Id.* at *7. The Court found no persuasive authority in Maryland for RDC's contention that a new restriction to Lot 6 would invalidate the Amended Declaration. *Id.* According to

13

the Court, the out-of-state cases cited by RDC were misplaced because the facts "differ vastly" from the case at bar. *Id.* The Amended Declaration, unlike any of the cases cited by RDC, did not create new restrictions, burdens, or covenants. *Id.* at *8. The Amended Declaration "simply clarified the terms of the Original Declaration by giving a definition to residential or agricultural land use that may become an annoyance or nuisance to the neighborhood or other Owners." *Id.* (internal quotation and footnote omitted).

The Court of Special Appeals also rejected RDC's argument that the restriction in Article III, Paragraph 1, Subparagraph (a) of the Original Declaration is void for vagueness, because the out-of-state cases cited by RDC were "readily distinguishable" on the facts. *Id.* The Court held that the Amended Declaration was legally enforceable against Lot 6. *Id.* at *6.

The Court of Special Appeals next dismissed RDC's contention that collateral estoppel bars the Homeowners from relitigating the issue of whether the driving range constitutes a "noxious or offensive trade or activity" or causes any "annoyance or nuisance to the neighborhood or other owners[.]" *Id.* at *9. According to the Court, the substance of the Original Declaration had yet to be litigated, which meant the Homeowners were not precluded from being heard on the issue. *Id.*

The Court of Special Appeals agreed with the circuit court that because the Amended Declaration had been determined valid and enforceable against Lot 6, the controversy regarding the Zajic Declaration became moot. *Id.* The Court also agreed with the circuit court that the Original Declaration permitted the realignment of Lot 6 boundary

14

lines under the Minor Revision Plat because the plain meaning of the Original Declaration prohibited the creation of additional lots, not a line revision. *Id.* at \*10.

**DISCUSSION**

**Standard of Review**

The standard of review for a grant of summary judgment is "whether the [circuit court] was legally correct." *Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 533, 836 A.2d 655, 669 (2003) (citation omitted). Upon review, this Court must consider the facts in a light most favorable to the non-moving parties, and "if those facts are susceptible to inferences supporting the position of the party opposing summary judgment, then a grant of summary judgment is improper." *Ashton v. Brown*, 339 Md. 70, 79, 660 A.2d 447, 452 (1995) (citation omitted). We review a circuit court's decision whether to grant or deny declaratory relief under an abuse of discretion standard. *Converge Servs. Grp., LLC v. Curran*, 383 Md. 462, 477, 860 A.2d 871, 879–80 (2004); Md. Code Ann., Cts. & Jud. Proc. § 3-409(a) ("Except as provided in subsection (d) of this section, a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding[.]").

We have stated that "the interpretation of a restrictive covenant, including a determination of its continuing vitality, is subject to [a] *de novo* [standard of] review as a legal question." *Dumbarton Imp. Ass'n v. Druid Ridge Cemetery Co.*, 434 Md. 37, 55–56, 73 A.3d 224, 235 (2013) (quoting *City of Bowie v. MIE Props., Inc.*, 398 Md. 657, 677, 922 A.2d 509, 521 (2007)). Principles of contract interpretation govern our review of a restrictive covenant. *City of Bowie*, 398 Md. at 677, 922 A.2d at 521. We look to the

15

objective intent of the original parties as it "appears or is implied from the [restrictive covenant] itself." *Dumbarton*, 434 Md. at 52, 73 A.3d at 233 (quoting *Balt. Butchers Abattoir & Live Stock Co. v. Union Rendering Co.*, 179 Md, 117, 122, 17 A.2d 130, 133 (1941)).

## Contentions of the Parties

RDC contends that the Amended Declaration is not enforceable because it imposes a new restriction—the prohibition of a driving range—that was not included in the Original Declaration. According to RDC, the circuit court and Court of Special Appeals erred by ruling that the Amended Declaration was merely a clarification of the Original Declaration. RDC argues that the Original Declaration never indicated whether a driving range was prohibited, so the Amended Declaration did not merely clarify the Original Declaration, but added a new wholesale restriction. In support of its argument, RDC cites *Walton v. Jaskiewicz*, 317 Md. 264, 563 A.2d 382 (1989), for the proposition that when the original declaration "does not expressly authorize the type of change sought to be made . . . the purported amendment is not valid." According to RDC, interpreting the Amended Declaration as a mere clarification would give the Homeowners unfettered discretion in prohibiting any activity that they deemed an annoyance or a nuisance.

RDC also argues that the circuit court and the Court of Special Appeals erred in its application of the "uniform plan of development" doctrine. According to RDC, the Original Declaration "does not provide that '[] Swan Point [] be used uniformly for residential development[,]'" because the plain language of the Original Declaration never imposed a requirement of solely residential use. (Citation omitted). According to RDC,

16

this Court has previously interpreted the specific omission of an activity in a restrictive covenant as an indication of the restrictive covenant permitting that activity.

Even if the Original Declaration imposed a uniform plan of a residential development, RDC claims there is no factual basis that a driving range would be inconsistent with a residential development. A golf course has continuously and contiguously operated alongside Swan Point for decades. At a minimum, RDC contends that the issue of whether the Original Declaration prohibits the operation of a driving range must be determined objectively and that RDC should be entitled to a trial on the issue. Alternatively, RDC argues that the issue of whether a driving range violates Swan Point's covenants is procedurally barred by *res judicata* and collateral estoppel.

The Homeowners counter that the Amended Declaration does not add new restrictions or exceed the scope of the original covenants. According to the Homeowners, RDC incorrectly applied a rule of strict construction to the Original Declaration when the Original Declaration unambiguously intended to create a small residential community of single-family homes. The Homeowners also argue that the circuit court and the Court of Special Appeals correctly determined that the Amended Declaration is consistent with the Original Declaration. The circuit court found that the Original Declaration intended to create a uniform plan of development for Swan Point that was restricted to residential and agricultural usages. According to the Homeowners, the uniform plan of development was an undisputed *factual finding* by the circuit court, not a legal conclusion.

The Homeowners contend that neither *res judicata* nor collateral estoppel apply. According to the Homeowners, *res judicata* is inapplicable in this case because the present

17

litigation and the former matter before the Board involved different causes of action, and the pertinent issue of restrictive covenant interpretation was not, nor could it have been litigated before the Board. The Homeowners also assert that collateral estoppel is inapplicable because its four elements are not satisfied in the case at bar. While the parties in the matter before the Board and the circuit court were the same, the issue of restrictive covenant interpretation was not actually litigated by the Board, because the Board expressly declined to consider the issue of restrictive covenants while making its zoning and variance decision.

On cross-appeal, the Homeowners argue that the circuit court and Court of Special Appeals failed to fully analyze the original covenants. An objective analysis of the original covenant, according to the Homeowners, evidences a clear intent for a quiet, residential community. The Homeowners contend that RDC mistakenly assumed that the original covenant was ambiguous. The Original Declaration expressly used the phrase "uniform plan of development" to communicate an intent for the six properties to retain a purely residential character. The only permitted deviation from the residential character in the community comes from a narrow exception for agricultural uses on Lot 6 contained in the Original Declaration.

**Analysis**

**A. Neither *res judicata* nor collateral estoppel apply.**

As a procedural matter, we note that the issue of whether the Original Declaration prohibited the construction and operation of a driving range on Lot 6 is not barred either by *res judicata* or collateral estoppel. In *MPC, Inc. v. Kenny*, 279 Md. 29, 367 A.2d 486

(1977), this Court explained the pertinent distinction between *res judicata* and collateral

estoppel:

> If the second suit is between the same parties and is upon the same cause of action, a judgment in the earlier case on the merits is an absolute bar, not only as to all matters which were litigated in the earlier case, but as to all matters which could have been litigated ([*res judicata*]).  If, in a second suit between the same parties, even though the cause of action is different, any determination of fact, which was actually litigated in the first case, is conclusive in the second case (collateral estoppel)[.]

*Id.* at 32, 367 A.2d at 489 (internal quotation and citation omitted).

*Res judicata* could not have applied in this case because the issues before the Board

and the circuit court were different, and the Homeowners never had an opportunity to

litigate the issue of the scope and meaning of the Original Declaration.  The Board

considered whether to grant a zoning variance and expressly declined to consider "the

effects of or to enforce any private restrictive covenants that may impact the subject

property."  The parties presented a distinct legal question before the circuit court

concerning the meaning and operation of restrictive covenants.  *See Colandrea v. Wilde*

*Lake Cmty. Ass'n*, 361 Md. 371, 392, 761 A.2d 899, 910 (2000) (noting one of the

requirements of the doctrine of *res judicata* is whether "the claim presented in the current

action is *identical* to the one determined in the prior adjudication[]") (emphasis added).

Collateral estoppel is also not applicable because the scope and meaning of the

Original Declaration was *not* decided by the Board.  *See Cosby v. Dep't of Hum. Res.*, 425

Md. 629, 639, 42 A.3d 596, 602 (2012) ("When an issue of fact or law is *actually litigated*

*and determined by a valid and final* judgment, and *the determination is essential to the*

*judgment*, the determination is conclusive in a subsequent action between the parties,

19

whether on the same or a different claim.") (citation omitted) (emphasis added). The Board

expressly stated that it would not interpret the restrictive covenants. Therefore, the issue

of whether the restrictive covenants prohibited the operation of a driving range was not

actually litigated in the first case. We conclude that neither *res judicata* nor collateral

estoppel apply.

**B. The unambiguous meaning of the Original Declaration was to create a residential community of single-family homes in Swan Point.**

In *Belleview Constr. Co. v. Rugby Hall Cmty. Ass'n*, this Court explained the

standard for construing restrictive covenants in Maryland:

> In construing covenants, '[i]t is a cardinal principle . . . that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself.' The language of the instrument is properly 'considered in connection with the object in view of the parties and the circumstances and conditions affecting the parties and the property. . . .' This principle is consistent with the general law of contracts. If the meaning of the instrument is not clear from its terms, 'the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources.'
>
> If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement. *The rule of strict construction should not be employed, however, to defeat a restrictive covenant that is clear on its face, or is clear when considered in light of the surrounding circumstances.*

321 Md. 152, 157–58, 592 A.2d 493, 495–96 (1990) (citations omitted) (emphasis added).

"In particular, our recent cases have identified *Belleview* as the seminal case

addressing the evolution of our covenant jurisprudence from a purely strict construction

approach to that of a reasonableness approach." *City of Bowie*, 398 Md. at 680, 922 A.2d

20

at 523 (citations omitted). "[R]easonable construction permits the consideration of the circumstances surrounding the adoption of the ambiguous covenant to effectuate the ascertainable intent of the parties." *Id.*, 922 A.2d at 523. "An ambiguity arises when the language of the [restrictive covenant] is susceptible of more than one meaning to a reasonably prudent person." *County Comm'rs of Charles Cty. v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001). "In endeavoring to arrive at the intention, the words used should be taken in their ordinary and popular sense, unless it plainly appears from the context that the parties intended to use them in a different sense, or that they have acquired a peculiar or special meaning in respect to the particular subject-matter." *Id.* at 447–48, 784 A.2d at 558 (quoting *Markey v. Wolf*, 92 Md. App. 137, 153, 607 A.2d 82, 90 (1992)).

"An ambiguity does not exist simply because a strained or conjectural construction can be given to a word." *Belleview*, 321 Md. at 159, 582 A.2d at 496. "[A] covenant need not address every conceivable issue or potential outcome to avoid being ambiguous; it need only provide a clear answer for the matter in dispute." *Dumbarton*, 434 Md. at 57, 73 A.3d at 235.

In *Belleview*, Rugby Hall Estates, a residential community, along with a majority of the owners of the lots in Rugby Hall Estates, executed and recorded a restrictive covenant stating, "only one single family dwelling for private residence purposes shall be erected on each lot." 321 Md. at 154, 582 A.2d at 494. Lot A contained a single-family home and was subdivided to create lots A and C. *Id.* at 155, 582 A.2d at 494. Belleview Construction Company attempted to construct a home on a newly created lot C, but Rugby Hall Estates

21

challenged the proposed construction as "contrary to the scheme of development of the community." *Id.* at 156, 582 A.2d at 495. This Court applied its reasonable construction approach to decide whether "each lot" described in the restrictive covenant referred to lots as conveyed by the original developer, Rugby Hall Estates, or as they stood following re-subdivision. *Id.* at 154, 582 A.2d at 493.

This Court held that the restrictive covenant plainly limited the construction of just one single-family home per lot, as conveyed by the original developer. *Id.* at 158, 582 A.2d at 496. This Court examined the language in the original deed of covenant to infer that the "general plan of the development was for an attractive and desirable community consisting of lots of substantial but varying sizes, with little or no repetition in shape." *Id.* at 159, 582 A.2d at 496. This Court also noted that the subdivision maintained this common plan of development for over thirty years. *Id.* at 159–60, 582 A.2d at 496. While the restrictive covenant did not expressly state whether "each lot" referred to the original subdivision of the community, this Court did not find any ambiguity in the original restrictive covenant after construing the instrument in its entirety. *See id.* at 159, 582 A.2d at 496 ("it almost defies common sense to suggest that although 'lot' obviously means a lot as conveyed by the developer virtually everywhere it is used in the deed of restrictions, it should somehow be afforded a different meaning . . . when it is used in this restriction.").

In *City of Bowie*, this Court followed the same analytical approach used in *Belleview* to similarly conclude as a matter of law that the language of the restrictive covenant was "clear and unambiguous as to the intent of [the] parties." 398 Md. at 682, 922 A.2d at 524. MIE Properties acquired a 466-acre parcel of land from the City of Bowie ("the City") with

22

the intent of partnering with the University of Maryland to create a research park on the property. *Id.* at 669, 922 A.2d at 516. University of Maryland withdrew from the project, but the original declaration of covenants maintained fourteen restricted usages for the property, ranging from "[o]ffice buildings for science, technology, research and related issues" to "convenience commercial establishments[.]" *Id.* at 669–70, 922 A.2d at 517. MIE Properties eventually leased a portion of the property to a dance studio. *Id.* at 672, 922 A.2d at 518. The City challenged this lease as a violation of the restrictive covenant for the property. *Id.*, 922 A.2d at 518.

This Court interpreted the fourteen enumerated uses of the property to conclude that the clear intent of the covenant was to "develop a research park, with or without the involvement of the University of Maryland." *Id.* at 683, 922 A.2d at 525. This Court analyzed the fourteen permitted uses of the land and determined that each was consonant with that overarching purpose, even though the covenant lacked any express language specifying that the particular purpose for the property was to develop a research park. *See id.*, 922 A.2d at 525 ("Both the Agreement and the Covenants originally enumerated [fourteen] permitted uses, each addressing that purpose."). "We may not invalidate a plainly written covenant to save a party from what may prove to be a poor business decision." *Id.*, 922 A.2d at 525 (footnote omitted). "Even if the instruments were ambiguous, the [circuit court] was not clearly erroneous in its factual finding as to the purpose of the Covenants." *Id.*, 922 A.2d at 525 (footnote omitted).

Similar to the covenants found in *Belleview* and *City of Bowie*, the Original Declaration, in the case at bar, does not state expressly that usage of Swan Point lots are

23

restricted to residential purposes, but it is plain from the four corners of the Original Declaration that the purpose of the instrument was to maintain the residential character of a small subdivision comprised of single-family homes.[12] The Original Declaration begins with a preamble stating the general purpose to impose restrictions that promoted the values and character of the community:

> WHEREAS, the Declarants desire to provide for *the preservation of the values and amenities in the community* comprised of their collective properties; and to this end, desire to impose upon the Property [i.e., Swan Point] the covenants, restrictions, easements and equitable servitudes, hereinafter set forth, each and all of *which are for the benefit of the Property and the owners thereof. . . .*

(Emphasis added). The preamble does not expressly state an intent to preserve the *residential* values and amenities of the community, but similar to *City of Bowie*, we review the restrictions following the preamble to ascertain that the overarching purpose of Original Declaration was to preserve the residential character of the community. Article III, Paragraph 1, Subparagraph (a) of the Original Declaration provides:

> No *noxious or offensive trade or activity* shall be carried on upon any Lot or within any dwelling, nor shall *anything* be done therein or thereon, which *may be or become an annoyance or nuisance to the neighborhood or other Owners. . . .*

(Emphasis added).

---

[12] We note that Article III, Paragraph 1, Subparagraph (t) states: "Notwithstanding any provision contained herein to the contrary, the Owner of Lot 6 shall be permitted to plant and harvest crops on Lot 6, including the leasing of such property to a farm tenant." This specific carve out recognized the preexisting agricultural activity on Lot 6 and further demonstrates that but for this one exception, the remainder of the Original Declaration is dedicated to the preservation of a single-family, residential community. *See Williar v. Balt. Butchers' Loan & Annuity Ass'n*, 45 Md. 546, 552 (1877) ("according to the maxim 'the exception proves the rule,' all other cases are left within the operation of the enacting clause.") (citation omitted).

While "noxious or offensive trade or activity" or the word "anything" may be capacious language, it is not ambiguous in context of the entire covenant and this present dispute. *See supra Dumbarton*, 434 Md. at 57, 73 A.3d at 235. It illustrates the intention of the Original Declaration in preserving the residential character of the subdivision by broadly restricting activities that would disturb the property owners of Swan Point. Article III, Paragraph 1, Subparagraph (a) continues with a demonstrative, but non-exhaustive list of activities that are prohibited:

> *Without limiting the generality of the foregoing*, no speaker, horn, whistle, siren, bell, amplifier or other sound device, except such devices as may be used exclusively for security purposes, shall be located, installed or maintained upon the exterior of any dwelling or upon the exterior of any other improvements constructed upon any Lot. No snowmobiles, go-carts, motor bikes, trail bikes or other loud engine recreational vehicles shall be run or operated upon any Lot or upon the roads serving the Property.

(Emphasis added).

These enumerated loud noise-making devices are distinctly residential in nature and therefore demonstrate a broad prohibition of activities that may be found on one lot that may disturb another residence within Swan Point. *See Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129, 111 S. Ct. 1156, 1163 (1991) ("Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.") (citation omitted). The security systems and recreational vehicles, referenced in the restriction, are made in relation to "any dwelling" or "any Lot[,]" which was defined elsewhere in the Original Declaration as belonging to "a residence of a *single person or family*." (Emphasis added). This Court has acknowledged that language

25

pertaining to "single-family" homes connotes a specific, limited use of property for quiet enjoyment, even more so than restrictive covenants merely using the term "residential." *See Lowden v. Bosley*, 395 Md. 58, 68–69, 909 A.2d 261, 267 (2006) (noting the usage of "single family" in a restrictive covenant narrows what can be construed as "residential"). The restrictions unambiguously seek to preserve the residential character of Swan Point.

The list of restricted activities provided in the Original Declaration prohibits any potentially disturbing commercial activities or trades, namely the hitting of golf balls, the operation of golf ball collection machines, or loud congregations of driving range patrons, because such activities were plainly not within the contemplated *residential* character of the subdivision. It would be unnecessary for the Original Declaration to have specifically prohibited golf activities or a driving range when every other restriction in the Original Declaration plainly pertains to the maintenance of a small, residential community of single-family homes.[13]

This interpretation is further supported by a series of other specific prohibitions in Article III, seeking to limit what a property owner or subsequent property owner may do to a lot and a single-family home located within the subdivision. A lot owner may not keep

---

[13] RDC argues that because Swan Point was developed next to a golf course, the omission of a specific restriction against golf or a driving range demonstrates that the activity is not prohibited under the Original Declaration. As a matter of construction, and contrary to RDC's contention, a specific prohibition against golf activities would undermine the purpose of the Original Declaration to maintain the subdivision's residential character by suggesting, through negative implication, that other unenumerated commercial activities were permitted. *In re Walker*, 473 Md. 68, __ n.9, 248 A.3d 981, 991 n.9 (2021) ("[T]o express or include one thing implies the exclusion of the other, or of the alternative[.]") (quoting *Walzer v. Osborne*, 395 Md. 563, 574 n.6, 911 A.2d 427, 433 n.6 (2006)).

or raise animal livestock, may not store junk or *commercial* vehicles, may not erect a temporary structure, may not place signage, may not place satellite dishes that are visible from the roadway, may not hunt, may not excavate the lots, may not place exterior lighting facing beyond the lot, and may not construct more than one single-family dwelling per lot except for caretakers homes.

The latter phrase in Article III, Paragraph 1, Subparagraph (a), "which may be or become an *annoyance or nuisance to the neighborhood* or other Owners[,]" provides an additional indication of the intent of the developers to preserve the residential character of Swan Point. (Emphasis added). Over a century ago, in *Lohmuller v. Samuel Kirk & Son Co.*, 133 Md. 78, 104 A. 270 (1918), this Court distinguished between an annoyance and a nuisance. *Id.* at __, 104 A. 270 at 274 ("While it shows that the noise complained of does subject the plaintiffs . . . to some annoyance and discomfort, the record does not, in our judgment, present such a clear case of an invasion by the defendant of the rights of the plaintiffs as entitled them to the relief prayed.").

Not everything that causes annoyance constitutes a nuisance, because a nuisance requires a substantial and unreasonable interference with a property owner's use and enjoyment of land. *Compare Exxon Mobil Corp. v. Albright*, 433 Md. 303, 410, 71 A.3d 30, 95 (2013) ("although there is no dispute that any interference with Appellees' properties by Exxon was unreasonable, *there is little to suggest that Appellees* with non-detect results *experienced a substantial interference*[]") (emphasis added), *with* Restatement (Second) of Torts § 821D (Am. Law Inst. 1979) (June 2021 Update) ("Freedom from discomfort and annoyance while using land is often as important to a

27

person as freedom from physical interruption with his [or her] use or freedom from detrimental change in the physical condition of the land itself."). The language used in the restrictive covenant demonstrates a broad and inclusive continuum of prohibited activities ranging from those that are merely an annoyance to those that satisfy the legal definition of nuisance.

We do not have to determine whether the construction and operation of a driving range would constitute a nuisance.[14] Our analysis is limited to what the drafters of the Original Declaration intended when using language restricting activities that may become an annoyance or nuisance as determined by the Homeowners. Without having to specify every possible annoying or nuisance activity, the Original Declaration employed broad

---

[14] The initial letter sent to Swan Point residents on behalf of RDC acknowledged the occurrence of errant golf balls leaving the driving range: "relocating the driving range will allow us to significantly reduce the number of golf balls flying on to Martingham Drive." We note several cases from our sister jurisdictions who have determined that errant golf balls or noise generated from golf activity may constitute a nuisance. *Gellman v. Seawane Golf & Country Club, Inc.*, 24 A.D.3d 415, 805 N.Y.S.2d 411 (2005) (holding that the operation of a driving range that allowed golf balls to escape the range and land on property across the street was a nuisance); *Mish v. Elks Country Club*, 35 Pa. D. & C.3d 435, 436 (1983) ("The continuing possibility (probability) that balls will strike plaintiffs' property is clearly an invasion of their interest in the private use and enjoyment of land."); *Sierra Screw Products v. Azusa Greens, Inc.*, 88 Cal. App. 3d 358, 370, 151 Cal. Rptr. 799, 806 (1979) (recognizing that operation of adjacent golf course may constitute nuisance despite enabling zoning ordinance); *Fenton v. Quaboag Country Club, Inc.*, 353 Mass. 534, 538–39, 233 N.E.2d 216, 219 (1968) ("The pertinent inquiry is whether the noise (the invasion of golf balls) materially interferes with the physical comfort of existence . . . according to the simple tastes and unaffected notions generally prevailing among plain people (nongolfers). The standard is what ordinary people (again those who eschew golf), acting reasonably, have a right to demand in the way of health and comfort under all the circumstances."); *Sans v. Ramsey Golf & Country Club, Inc.*, 29 N.J. 438, 449, 149 A.2d 599, 606 (1959) ("the activities of defendant [golf course operator] are manifestly incompatible with the ordinary and expected comfortable life in plaintiffs' home").

28

language to ensure property owners at Swan Point could enjoy and maintain the residential character of their community.

The Original Declaration also tied the determination of what constitutes an annoyance to the owners of Swan Point: "which may be or become an annoyance or nuisance *to the neighborhood or other Owners*." (Emphasis added). Both the Court of Special Appeals and circuit court correctly noted that what this particular "neighborhood" deems an annoyance necessarily required a subjective interpretation by the majority of lot owners of Swan Point. The Original Declaration also instructs that interpretation of the restrictive covenants is to be made liberally and in conformance with its overarching purpose to create a uniform, residential community: "The provisions hereof shall be liberally construed to effectuate the purpose of creating a uniform plan for the development and operation of the Property." Similar to *Belleview*, Swan Point maintained this uniform plan of development for thirty years. *See* 321 Md. at 160, 582 A.2d at 496. We find no indication in the record that the circuit court's finding as to Swan Point's uniform plan of development as a residential community was clearly erroneous.

We conclude that the Original Declaration unambiguously imposed restrictions on certain activities, both residential and commercial, to preserve the residential character and uniform plan of development of a small, single-family community.[15]

---

[15] By implication of its unambiguous language, we also conclude that the Original Declaration was not too vague to be enforced.

**C. The Court of Special Appeals correctly determined that the Amended Declaration clarified the Original Declaration by prohibiting commercial driving ranges on the six lots of Swan Point.**

We need not resolve whether the Original Declaration would have prohibited a driving range on Lot 6 because we agree with the Court of Special Appeals and circuit court that the Amended Declaration was consistent with the Original Declaration and validly prohibited a driving range on any lot within Swan Point.[16] Pursuant to Article IV of the Original Declaration, the Homeowners specified the following amendment:

> (u) No Lot within the Property, nor any portion thereof, shall be converted from residential or agricultural use into a commercial or private golf course use, nor shall any Lot be utilized as or in connection with a driving range or similar commercial use in connection with a golf course, it being the intent of the subscribers hereto that the Swan Point subdivision retain its character as a residential, single family dwelling community, and not be converted into a commercial resort property for use by members of the public, golf course members, or resort hotel guests.

---

[16] Homeowners contended on cross-petition that the circuit court and the Court of Special Appeals erred by failing to render an analysis of whether the Original Declaration restricted Lot 6 to residential or agricultural usages. Neither the circuit court nor the Court of Special Appeals erred in this regard as each court necessarily analyzed the Original Declaration to conclude, respectively, that a driving range would violate the uniform, residential character of Swan Point. *RDC Melanie Drive*, 2020 WL 5989518, at *7–8 ("Indeed, the Swan Point lots were purely residential, unlike the bordering Martingham subdivision. . . . We agree with the circuit court that [the Amended Declaration] is consistent with the Original Declaration and supports a uniform plan for the development of the property. Notably, a driving range would not support the uniformity of an otherwise residential community[]"); *Eppard*, C-20-CV-18-000079, at *18 ("The scope of the Amended Declaration was within the reasonable contemplation of the Original Declaration[.] . . . One could reasonably anticipate such an amendment from the plain language of the Original Declaration."). Similarly, the circuit court and Court of Special Appeals did not err in failing to address Article III, Paragraph 1, Subparagraph (m) of the Original Declaration or integrating the Zajic Declaration into their analysis. For reasons previously stated, neither of these provisions warranted individual consideration by the circuit court and Court of Special Appeals in reaching their respective decisions.

30

RDC cites *Walton* for the proposition that a majority of landowners cannot enact an amendment over the objection of a minority of landowners within a subdivision. RDC's reliance on *Walton* is misplaced, and supports our conclusion that the Amended Declaration clarified the purpose of the Original Declaration to preserve the residential character of Swan Point. In *Walton*, a developer recorded a restrictive covenant stating, "[t]here shall be no further subdivision of lots in this tract." 317 Md. at 265, 563 A.2d at 382. The preamble to the restrictive covenant expressed an intent to assure uniformity of development and to "make certain that said restrictions shall apply uniformly to all the lots in said subdivision[.] . . ." *Id.*, 563 A.2d at 382. A family owned Lot 26 in the subdivision and wished to split its lot into two smaller properties. *Id.* at 266, 563 A.2d at 383. The Walton family obtained the support of a majority of owners and amended the restrictive covenant to read: "Except for Lot 26, Plat Two as shown on the Plat of Subdivision, there shall be no further subdivision of lots in this tract. Lot 26, Plat Two shall not be resubdivided into more than two lots." *Id.*, 563 A.2d at 383. Edmond Jaskiewicz and a minority of other owners opposed the amendment. *Id.*, 563 A.2d at 383.

This Court held that the amendment was not authorized by the original restrictive covenant because it violated the original intent of the developers to *uniformly* apply the restriction to the entire subdivision. *Id.* at 272–73, 563 A.2d at 386. While the original restrictive covenant permitted changes through amendment, an amendment must maintain the intent of the original restrictive covenant to apply restrictions uniformly to all lots within the residential subdivision. *Id.* at 272, 563 A.2d at 386.

31

In the case at bar, and consistent with *Walton*, the majority of property owners amended the Original Declaration, while maintaining the intent of the Original Declaration to uniformly impose restrictions that maintain the residential character of the subdivision. Both the Original Declaration and the Amended Declaration seek to preserve the residential character of Swan Point by imposing restrictions that apply *uniformly* to each lot in the subdivision. Unlike *Walton*, the majority of Homeowners at Swan Point did not attempt to deviate from the uniform, residential character of the subdivision. The owners clarified the preexisting, uniform, and broad restriction against offensive, noxious, annoying, or nuisance activities that applied to all lots in Swan Point by specifying a driving range as one such activity. Had the Homeowners amended the Original Declaration by prohibiting golf activities *solely* on Lot 6, then *Walton* would control, and the amendment may have been invalid. We hold that the Amended Declaration validly clarified a restriction against activities contravening the residential character of Swan Point.[17]

---

[17] We neither need to discuss, nor distinguish, the out-of-state cases cited by RDC because, as the Court of Special Appeals correctly noted, "the terms of the Original and Amended Declarations in this case differ vastly from the restrictions and covenants in the out-of-state cases." *RDC Melanie Drive,* 2020 WL 5989518, at \*7. We also reject the Homeowners' argument that the circuit court failed in granting injunctive relief and the Court of Special Appeals failed to remand the case to address the question of injunctive relief. "The issuance of a declaratory judgment does not lead ineluctably to ancillary relief, such as an injunction." *Falls Road Cmty. Ass'n*, *v. Baltimore County*, 437 Md. 115, 150, 85 A.3d 185, 206 (2014). "In some instances, a declaratory judgment may itself eliminate the need for injunctive relief[.] . . ." *See id.* n.44, 85 A.3d at 206 n.44.

**D. The Court of Special Appeals correctly concluded that Article III, Paragraph 1, Subparagraph (k) of the Original Declaration permitted RDC to make a lot line revision.**

The plain text of Article III, Paragraph 1, Subparagraph (k) of the Original Declaration clearly permitted the *revision* of existing lot lines:

> (k) No Lot shall be subdivided; provided, however, that this restriction shall *not be construed to prohibit the adjustment or realignment of boundary lines between Lots as long as such adjustment or realignment shall not create an additional Lot.*

(Emphasis added).

In the case at bar, RDC recorded the "Minor Revision Plat" to adjust the boundary line between Lot 6 and the Links. There is nothing in the record to suggest that RDC created a new lot from the realignment of the boundary lines. We agree with both the circuit court and the Court of Special Appeals "that the plain language of the Original Declaration is consistent with the Minor Revision Plat." *RDC Melanie Drive*, 2020 WL 5989518, at *10.

## CONCLUSION

For the reasons previously explained, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

33